TINDER, Circuit Judge.
Plaintiff-Appellants, members and officers of the International Union of Operating Engineers, Local 150, AFL-CIO (“the Union”) appeal the district court’s dismissal of their suit, arguing that the Indiana Right to Work Act violates their rights under the United States Constitution and is preempted by federal labor legislation. Because the legislation is not preempted by the scheme of federal labor law and does not violate any constitutional rights, we affirm the district court’s dismissal of the suit.
I
After a “rancorous, partisan” month-long fight during which “hundreds of union members crowded, day after day, into the Statehouse halls,”[1] the Indiana legislature passed the Indiana Right to Work Act on February 1, 2012, and Governor Mitch Daniels signed the legislation into law. The law’s relevant provisions for this litigation are the following.
Section 8, which spells out the principal prohibitions of the Right to Work Act:
A person may not require an individual to:
(1) Become or remain a member of a labor organization;
(2) Pay dues, fees, assessments, or other charges of any kind or amount to a labor organization; or
(3) Pay to a charity or third party an amount that is equivalent to or a prorata part of dues, fees, assessments or other charges required of members of a labor organization as a condition of employment or continuation of employment.
Ind.Code § 22-6-6-8.
Section 3, which makes clear what substantive provisions of the Right to Work Act are to be construed to apply to the building and construction industry:
Nothing in this chapter is intended, or should be construed, to change or affect any law concerning collective bargaining or collective bargaining agreements in the building and construction industry other than:
(1) a law that permits agreements that would require membership in labor organization;
*658 (2) a law that permits agreements that would require the payment of dues, fees, assessments, or other charges of any kind of amount to a labor organization; or
(3) a law that permits agreements that would require the payment to a charity or a third party of an amount that is equivalent to or a pro rata part of dues, fees, assessment, or other charges required of members of a labor organization;
as a condition of employment.
Ind.Code § 22-6-6-3.
And Section 13, which makes clear that Sections 8-12 of the Act apply prospectively:
Sections 8 through 12 of this chapter:
(1) apply to a written or oral contract or agreement entered into, modified, renewed, or extended after March 14, 2012; and
(2) do not apply to or abrogate a written or oral contract or agreement in effect on March 14, 2012.
Ind.Code § 22-6-6-13.
On February 22, 2012, Plaintiff-Appellants, officers and members of the International Union of Operating Engineers, Local 150, AFL-CIO (“the Union”), brought suit in federal district court against the Governor of Indiana, the Attorney General of Indiana, and the Commissioner of the Indiana Department of Labor in their official capacities, seeking declaratory relief. They alleged that the Indiana Right to Work Act violates the United States Constitution and the Indiana Constitution. They further argued that the scheme of federal labor law, specifically the National Labor Relations Act (“NLRA”), 29 U.S.C. § 151 et seq., preempts §§ 8(2)-(3) and 3(2)-(3) of the new legislation. On January 17, 2013, the federal district court granted Defendant-Appellees’ Motion to Dismiss on the preemption claim and the federal constitutional claims. Plaintiff-Appellants timely appealed.[2]
II
On appeal, Plaintiff-Appellants raise two varieties of issues: whether the law is preempted by the federal scheme of labor law, and whether the Indiana law violates the United States Constitution. We answer in the negative to both questions.
1. Federal Preemption
Plaintiff-Appellants’ main argument asserts that the Indiana right-to-work law is preempted by federal legislation on the same topic.
The history of the federal legislation in question is important here. Congress enacted the Wagner Act in 1935 and amended it through the Labor Management Relations Act of 1947, better known as the Taft-Hartley Act. The Taft-Hartley Act included several provisions intended to *659 ameliorate perceived imbalances in the NLRA. In particular, Congress was concerned about abuses stemming from the “closed shop,” a union-security agreement whereby an employer agreed to hire only union members. Section 8(3) of the Wagner Act was accordingly amended to ban closed shops. However, the amended Section 8(3) “shield[ed] from an unfair labor practice charge less severe forms of union-security arrangements than the closed or union shop.” NLRB. v. Gen. Motors Corp., 373 U.S. 734, 739, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). For example, it permitted “an arrangement ... requiring nonunion members to pay to the union $2 a month ‘for the support of the bargaining unit.’ ” Id.
Although Congress permitted less restrictive, post-hiring union-security agreements under federal law, it also left states free to ban them. Section 14(b) of the Act provided that Section 8(3) did not protect a union-security agreement if it was “prohibited by State or Territorial law.” By the time Section 14(b) was included in the NLRA, “twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices,” laws “about which Congress seems to have been well informed during the 1947 debates. ...” Retail Clerks Int’l Ass’n, Local 1625 v. Schermerhorn, 375 U.S. 96, 100, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) (“Retail Clerks II”).
In relevant part, Section 8(a)(3) of the NLRA now reads:
It shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure or employment or any term or condition of employment to encourage or discourage membership in any labor organization.
Provided, That nothing in this sub-chapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein....
29 U.S.C. § 158(a)(3).
And Section 14(b) of the NLRA provides:
Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.
29 U.S.C. § 164(b).
The Supreme Court has clarified the relationship between these two provisions: § 14(b) was intended to prevent other sections in the NLRA from “completely extinguishing state power over certain union-security arrangements.” Retail Clerks Intern. Ass’n, Local 1625 v. Schermerhorn, 373 U.S. 746, 751, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963) (“Retail Clerks 7”). Specifically, “[Section 14(b) ] was designed to make certain that § 8(a)(3) could not be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy.” Id. (citations and internal quotation marks omitted). Thus, we read Section 14(b) as protecting states’ authority to enact laws prohibiting union-security arrangements that are permissible under Section 8(a)(3) and other provisions of the NLRA. This reading was underscored by the Supreme Court’s decision in Retail Clerks II, which declared that the legislative history “ma[de] clear and unambiguous the purpose of Congress not to preempt the field.” Retail Clerks II, 375 U.S. at 101, 84 S.Ct. 219. The Court concluded “that Congress in 1947 did not deprive the *660 States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements” and that “it is plain that Congress left the States free to legislate” in the field of union-security agreements. Id. at 102, 84 S.Ct. 219. The freedom reserved to the states is extensive; “even if [a] union-security arrangement clears all federal hurdles, the States by reason of § 14(b) have the final say and may outlaw it.” Id. at 102-03, 84 S.Ct. 219. The Supreme Court could not have been more explicit regarding the broad authority of states to prohibit union-security agreements.
It is against this backdrop of states’ extensive authority, reserved to them by the language of the statute and the Supreme Court’s interpretation, that we consider Plaintiff-Appellants’ argument that provisions of the Indiana right-to-work legislation are preempted by federal labor legislation. Their primary argument is that Section 14(b) permits states to ban only union-security agreements “requiring member ship,” or else compelling workers to pay a full membership fee that serves as the functional equivalent of membership. The Indiana statute goes further by prohibiting unions from collecting any fees and dues from unwilling employees. The Plaintiff-Appellants assert that this ban is too strict because employees may still be required to pay a fee equal to their “fair share” of the collective bargaining costs— something less than the full membership fee—and not qualify as “members” of the union under Section 14(b). Section 8(a)(3), which permits such arrangements, would then, according to this argument, apply in full force and preempt any state statute barring the union’s practice.
Plaintiff-Appellants further argue that such a reading is necessary because unions are required to act on behalf of all employees in labor disputes, and may not discriminate against non-members. To compel the union to represent all employees equally using dues contributed only by some workers, they argue, creates a free-rider problem. Indeed, the Supreme Court has observed that Section (8)(3) “was designed to remedy the inequities posed by ‘free riders’ who would otherwise unfairly profit from the Taft-Hartley Act’s abolition of the closed shop.” Commc’ns Workers of Am. v. Beck, 487 U.S. 735, 753-54, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).
We are not convinced that Section 8(3) preempts the Indiana statute, for several reasons.
a. Interpretations of the Term “Membership” in the NLRA Context
Plaintiff-Appellants and the dissent admit that the Supreme Court has construed the term “membership” to have the same meaning in Sections 8(a)(3) and 14(b). Indeed, there is no reason to think that the term “membership” in Section 14(b) would mean something different from the term “membership” in Section 8(a)(3) of the same act. See Sorenson v. Sec’y of Treasury of U.S., 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (“The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.”) (citation and quotation marks omitted). As a result, “the agreements requiring ‘membership’ in a labor union which are expressly permitted by the proviso are the same ‘membership’ agreements expressly placed within the reach of state law by § 14(b).” Retail Clerks I, 373 U.S. at 751, 83 S.Ct. 1461. If membership for purposes of Section 8(a)(3) encompasses “an arrangement ... requiring nonunion members to pay to the union $2 a month ‘for the support of the bargain *661 ing unit,’ ” Gen. Motors, 373 U.S. at 739, 83 S.Ct. 1453, then membership under Section 14(b) should likewise extend to such fees.
The Supreme Court has described union membership as synonymous with paying the portion of dues germane to the union’s collective bargaining. It has held that the term “membership” in Section 8(a)(3) has been “whittled down to its financial core.” Gen. Motors, 373 U.S. at 742, 83 S.Ct. 1453. And the Supreme Court has also made clear that this “financial core” of union membership extends to “only those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.”[3] Beck, 487 U.S. at 763, 108 S.Ct. 2641 (citation and internal quotation marks omitted); see also id. at 745, 108 S.Ct. 2641 (“The statutory question presented in this case ... is whether this ‘financial core’ includes the obligation to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment. We think it does not.”). In other words, Representation Fees—those fees germane to collective bargaining, contract administration, and grievance adjustment—constitute the “financial core” of membership for the purposes of Section 8(a)(3) and for Section 14(b). Therefore, Section 14(b)’s express allowance of state laws prohibiting “agreements requiring membership in a labor organization as a condition of employment” necessarily permits state laws prohibiting agreements that require employees to pay Representation Fees (emphasis added).[4]
In the alternative, we find compelling the fact that the position advanced by the Union and adopted in the dissent necessarily entails reading § 8(a)(3) as making § 14(b) superfluous. As noted above, in Beck the Supreme Court stated that “§ 8(a)(3) ... authorizes the exaction of only those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.” 487 U.S. at 762-63, 108 S.Ct. 2641 (citation and internal quotation marks omitted); see Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 38, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (“§ 8(a)(3) does not permit unions to exact dues or fees from employees for activities that are not germane to collective bargaining, grievance adjustment, or contract administration.”). In arguing that Representation Fees are permissible in all jurisdictions, including states that have promulgated right-to-work laws in accordance with § 14(b), the Union is asserting that all states must *662 allow unions to negotiate the broadest, largest possible union-security arrangement permitted under § 8(a)(3). That can’t be right.
Both of these points are more compelling than the alternative readings of “membership” presented to us by the Plaintiff-Appellants, who hang their interpretation on several slender branches: two contemporaneous dictionary definitions, and a federal statutory definition found in a different statute passed twelve years after the Taft-Hartley Act. See The Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq. Not only are both of these sources extraneous to the statute we are charged to interpret in this case, but they also cannot alter the Supreme Court’s later construction of the term “membership” in the Retail Clerics cases and Beck.
b. State Statutory Schemes Concurrent with Taft-Hartley
Also compelling are the state right-to-work laws in effect at the time of the Tafl>-Hartley Act’s passage in 1947. As the Supreme Court stated in Retail Clerks II, twelve states had right-to-work laws in effect when Taft-Hartley was enacted: Arizona, Arkansas, Georgia, Iowa, Nebraska, Nevada, North Carolina, North Dakota, South Dakota, Tennessee, Texas and Virginia.[5] These laws fell into two different categories. The first broadly disallowed compulsory union membership. The second included specific provisions outlawing compulsory payment of dues or fees to labor organizations. An example of a statute from the second group is Iowa’s right-to-work law, which was enacted on April 28, 1947, two months before the passage of the Taft-Hartley Act:
Sec. 1. It is declared to be the policy of the State of Iowa that no person within its boundaries shall be deprived of the right to work at his chosen occupation for any employer because of membership in, affiliation with, withdrawal or expulsion from, or refusal to join, any labor union, organization, or association, and any contract which contravenes this policy is illegal and void.
[•••]
Sec. 4. It shall be unlawful for any person, firm, association, labor organization or corporation, or political subdivision, either directly or indirectly, or in any manner or by means as a prerequisite to or condition of employment to require any person to pay dues, charges, fees, contributions, fines or assessments to any labor union, labor association or labor organization.
Iowa Code § 736A.1, 4 (1947), renumbered as Iowa Code § 731.1, 4 (1977).
All told, of the twelve state right-to-work statutes in effect in 1947, more than half-seven—included language similar to Indiana’s and Iowa’s statutes. ArkCode Ann. § 11-3-303 (1947); GaCode Ann. § 34-6-22 (1947); Iowa Code § 731.4 (en *663 acted 1947, renumbered 1977); Neb.Rev. Stat. § 48-217 (1947); N.C. Gen.Stat. § 95-82 (1947); Tenn.Code Ann. § 50-1-203 (1947); Va.Code Ann. § 40.1-62 (enacted 1947, renumbered 1970). Congress was well aware of these statutes when it drafted Section 14(b). See H.R.Rep. No.245, 80th Cong., 1st Sess. 34, reprinted in I Legislative History of the Labor Management Relations Act of 19k7 324 (1948) (listing states with such statutes). As discussed above, the stated purpose of Section 14(b) was to preserve the efficacy of laws like these—statutes that allowed states to place restrictions of their choosing on union-security agreements, including restrictions on whether employees could be compelled to pay dues or fees of any kind to a union.[6]
Presently, twenty-four states have some form of a right-to-work law.[7] The overwhelming majority of jurisdictions—eighteen, by our count, including Guam-have adopted language substantially identical to the prohibition in Ind.Code § 22-6-8(2). See AlaCode § 25-7-34 (1953); ArkCode Ann. § 11-3-303 (1947); GaCode Ann. § 34-6-22 (1947); Idaho Code Ann. § 44-2003(3) (1985); 22 Guam Code Ann. § 4103(3) (2000); iowa code § 731.4 (transferred 1977); La.Rev.Stat. Ann. § 23:983 (1976); Mich. Comp. Laws § 423.17 (2013); Miss. Const, art. 7, § 198-A (1960); Neb. RevStat. § 48-217 (1947); N.C. Gen.Stat. § 95-82 (1947); Okla. Const, art. 23, § 1A (2001); S.C.Code Ann. § 41-7-30 (1954); Tenn.Code Ann. § 50-1-203 (1947); Tex. Lab.Code Ann. § 101.004 (1993); Utah Code Ann. § 34-34-10 (1955); VaCode Ann. § 40.1-62 (1947); Wyo. Stat. Ann. § 27-7-111 (1963); see also N.D. Cent. Code § 34-01-14.1 (1987), repealed by NLRB v. North Dakota, 504 F.Supp.2d 750 (D.N.D.2007). The longevity of many of these statutes, coupled with the lack of disapproval expressed by the Supreme Court, suggests to us that Indiana’s right-to-work law falls squarely within the realm of acceptable law.
We also find persuasive a decision by the D.C. Circuit, the only decision from a sister circuit to squarely address the question before us.[8] Faced with the question *664 of whether a union could assess non-union employees for Representation Fees in four right-to-work states, the D.C. Circuit found, on the basis of the legislative history of the Taft-Hartley Act, that the assessment of such fees constituted an unfair labor practice. Journeymen & Apprentices, 675 F.2d at 1260-62. The D.C. Circuit held that “Congress knew precisely what state laws it was validating when it passed § 14(b)” as “[t]he House Report listed each state which had passed a right-to-work law or constitutional provision.” Id. at 1260. Specifically, the D.C. Circuit was persuaded that “Congress also knew about the free rider problem posed by such laws when it sanctioned such laws by passing § 14(b),” as shown by a comment in the Senate Committee report on the bill reflecting unions’ concerns about free riders,[9] as well as Senator Taft’s rebuttal on that point that “[m]any states have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in such states illegal. As stated in the report accompanying the Senate committee bill, it was not the intent to deprive the States of such power.” Id. at 1260-61 (citation omitted). And the D.C. Circuit noted that this problem was so well known that President Truman criticized it in his veto message. Id. at 1261.
Plaintiff-Appellants are right that Congress was concerned that banning the closed shop would create a free-rider problem, but only in those states that had no additional restriction on union-security agreements. Id. at 1260 (“[LJeaders of organized labor have stressed the fact that in the absence of [anti-union-security] provisions many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.”) (quoting the Report of the Senate Committee on Labor and Public Welfare presented by Senator Taft, 80th Cong., 1st Sess. 6, April 17, 1947). On the other hand, Congress explicitly permitted states that did restrict those agreements to find their own solution to the free-rider problem, if it was a problem in those states. Indeed, unions continue to thrive and assert significant influence in several right-to-work states, including Iowa,[10] where provisions equiva *665 lent to Indiana’s have been in effect for more than sixty-five years. If the Plaintiff-Appellants believe that Indiana’s law will create a new or unexpectedly severe free-rider problem, they may address those concerns to Congress.
In sum, in reviewing this substantial body of empirical evidence, we are not persuaded by Plaintiff-Appellants’ claims that Indiana’s law is somehow an extraordinary measure distinct from the numerous state statutes that have harmoniously existed under the federal labor law framework. Nor are we persuaded by their assertions that Indiana’s law represents a mortal threat to the continuing existence of unions as provided under federal law. Section 8(2) of the Indiana right-to-work statute is thus not preempted by the NLRA.
c. Plaintiff-Appellants’ Miscellaneous Preemption Arguments
Plaintiff-Appellants assert two other preemption arguments. Both deserve only quick consideration.
The first assertion, that federal labor law preempts the Indiana law’s criminal penalties, clashes squarely with language in Retail Clerks II, where the Supreme Court stated that
In light of the wording of § 14(b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements. Since it is plain that Congress left the States free to legislate in that field, we can only assume that it intended to leave unaffected the power to enforce those laws.
Retail Clerks II, 375 U.S. at 102, 84 S.Ct. 219.
The Union’s second argument is that the NLRA preempts § 8(3) of the statute, which bars mandatory payments of an amount equivalent to union dues to a charity. They rely on § 19 of the NLRA, which allows conscientious objectors to pay dues to a charity rather than to a union. But the applicability of that section naturally presupposes the existence of a union-security agreement that requires the payment of dues. And as we have demonstrated, states are permitted to restrict or prohibit such agreements. We agree with the district court’s assessment that “[njothing in the language of § 19 suggests or supports interpreting it as an exemption to § 14(b) that would preempt any state attempt to outlaw the kind of provision that § 19 permits.” Sweeney v. Daniels, 2013 WL 209047, *11 (N.D.Ind. Jan. 17, 2013).
2. Federal Constitutional Claims
The dissent claims that our interpretation of the federal statutory schema works an unconstitutional taking on Hoosier unions. We consider this argument first. Plaintiff-Appellants also allege violations of the Contracts, Ex Post Facto, and Equal Protection Clauses of the United States Constitution. Because both their Contracts and Ex Post Facto Clause arguments have force only if the statute applies retroactively, we consider them together.
a. Indiana’s Law Does Not Work an Unconstitutional Taking
The dissent asserts that, should we hold that the federal statutory scheme does not preempt Indiana’s right-to-work statute, that holding likely violates the Takings *666 Clause of the Fifth Amendment, as applied to the states under the Fourteenth Amendment. Dissent at 679-80. We observe that no argument based on the Takings Clause was advanced by the Union, and so any such argument was forfeited. See Jackson v. Parker, 627 F.3d 634, 640 (7th Cir.2010) (noting that arguments not raised before the district court are forfeited); Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int’l Drywall & Decorating, Inc., 493 F.3d 782, 790 (7th Cir.2007) (noting that arguments not raised in the opening brief are forfeited). And there is the problem of whether'the Union has sued the proper defendants for the purposes of advancing a claim under the Takings Clause. The Union’s alleged deprivation is the product of federal law and the Indiana statute operating in tandem. Because it is federal law that provides a duty of fair representation, Indiana’s right-to-work statute does not “take” property from the Union—it merely precludes the Union from collecting fees designed to cover the costs of performing the duty. Even supposing the Union could justify its suit by invoking something like the tort doctrine of “concurrent actual causes,”[11] the dissent has not explained why the proper remedy would be to strike down Indiana’s right-to-work statute rather than striking down or modifying the federal law imposing on all unions the duty of fair representation, in right-to-work states and non-right-to-work states alike.
Even so, we engage with the dissent’s position because we believe it overlooks the fundamental fact that distinguishes the union’s duty of representation from the other hypotheticals it presents. That is to say: we believe the union is justly compensated by federal law’s grant to the Union the right to bargain exclusively with the employer. The reason the Union must represent all employees is that the Union alone gets a seat at the negotiation table. See Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 761, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (A “union’s status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion.”); Hughes Tool Co., 104 N.L.R.B. 318, 324-25 (1943) (“[A] union could not assess nonmembers for costs arising from contract negotiations for the latter are the exclusive duty and prerogative of the certified representative which the nonmember minority is both entitled to and bound under.”). The powers of the bargaining representative are “comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents.” Steele v. Louisville & N.R. Co., 323 U.S. 192, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944). The duty of fair representation is therefore a “corresponding duty” imposed in exchange for the powers granted to the Union as an exclusive representative. Id. It seems disingenuous not to recognize that the Union’s position as a sole representative comes with a set of powers and benefits as well as responsibilities and duties. And no information before us persuades us that the Union is not fully and adequately compensated by its rights as the sole and exclusive member at the negotiating table.
b. Contracts and Ex Post Facto Clause Arguments
The Contracts Clause provides that “[n]o State shall ... pass any ... law *667 impairing the Obligation of Contracts.” U.S. Const, art. I, § 10, el. 1. A state violates the Contracts Clause when a “change in state law has operated as a substantial impairment of a contractual relationship.” Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (citation and internal quotation marks omitted). The relevant inquiry has three components: 1) whether there is a contractual relationship; 2) whether a change in law impairs that contractual relationship; and 3) whether the impairment is substantial. Council 31 of the Am. Fed’n of State, Cnty., & Mun. Emps. v. Quinn, 680 F.3d 875, 885 (7th Cir.2012) (citing Khan v. Gallitano, 180 F.3d 829, 832 (7th Cir.1999)). The Ex Post Facto Clause is violated by state or federal legislation that “makes an act done before the passing of the law, and which was innocent when done, criminal, and punishes such action.” Peugh v. United States, — U.S.-, 133 S.Ct. 2072, 2081, 186 L.Ed.2d 84 (2013) (citation and internal quotation marks omitted). The parties agree that for the Indiana law to violate these clauses of the Constitution, the law must have some retroactive application: it must either impair an already existing contract or else punish past conduct. We find that the law does not apply retroactively.
This conclusion is relatively easy to reach because Section 13 of the Indiana statute provides that the substantive provisions of the legislation—Sections 8 through 12—apply only to contracts entered into after March 14, 2012, and “do not apply to or abrogate a written or oral contract or agreement in effect on March 14, 2012.” Ind.Code § 22-6-6-13. The main objection Plaintiff-Appellants make here is to Section 3 of the statute. They argue that Section 3 is a substantive provision not mentioned in Section 13, and that it thus has retroactive application.
In interpreting the language of a statute, we “must examine the language and design of the statute as a whole.” Wells Fargo Bank, Nat’l Ass’n v. Lake of Torches Econ. Dev. Corp., 658 F.3d 684, 694 (7th Cir.2011) (citations and internal quotation marks omitted). And we must also keep in mind “[t]he presumption against retroactive legislation,” which “embodies a legal doctrine centuries older than our Republic.” Vartelas v. Holder, — U.S. -, 132 S.Ct. 1479, 1486, 182 L.Ed.2d 473 (2012) (citation and internal quotation marks omitted). We are inclined to agree that Section 3 is an oddly drafted provision. It resides in a neighborhood of prefatory clauses, nestled amid definitions of key terms and exceptions, but its sub-sections appear surprisingly substantive: indeed, Section 3’s sub-provisions are identical in content to the subsections of Section 8. However, Section 3’s main clause is drafted in the language of exception. It explains that the statute should not be read to change the laws of the building and construction industry, an industry that has its own set of elaborate labor laws, except to prohibit agreements of the type banned by Section 8. It is a double negative—no change except the following changes—that would be more comprehensible if drafted in the positive, but the placement of the clause makes sense among the other prefatory, exclusionary clauses like Sections 1 (“This chapter does not apply to the following: ....”) and 2 (“This chapter does not apply to the extent that____”). Ind.Code §§ 22-6-6-1, 2. In light of the design of the statute as a whole, we are satisfied that the provision in question is prefatory, not substantive. It simply explains the domains to which the substantive portions of the statute apply. To the extent that Section 3 contains substantive language, it is language that simply points to the later substantive sections outlawing union-security clauses. *668 This reading best harmonizes the structure of the statute and the presumption against retroactive legislation.[12]
c. Equal Protection Clause Arguments
The Equal Protection Clause of the Fourteenth Amendment states that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV. Equal protection scrutiny is triggered “when a regulation draws distinctions among people based on a person’s membership in a ‘suspect’ class” or based on “a denial of a fundamental right.” Srail v. Vill. of Lisle, Ill., 588 F.3d 940, 943 (7th Cir.2009) (citations omitted). If either a suspect class or fundamental right is implicated, “the government’s justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause.” Id. But if neither condition is present, the proper standard of review is rational basis. Id.
Plaintiff-Appellants argue that the Indiana Right to Work Act violates the Equal Protection Clause in two ways: (1) because it allows free riders to infringe on union members’ First Amendment free speech rights, and (2) because it allows free riders to infringe on the right of union membership, which is a fundamental right because it involves the exercise of First Amendment association and assembly rights. We hold that the law does not violate the equal protection clause because it does not implicate a fundamental right, and it passes the low bar of rational basis review with ease.
i. First Amendment Free Speech Rights
The stronger of Plaintiff-Appellants’ two equal protection arguments is the assertion that non-payors of Representation Fees will be free-riders who siphon valuable Union resources away from the Union’s political activities. In diminishing the financial resources available to the Union for political speech, Plaintiff-Appellants argue, the Indiana law in fringes on the Union’s First Amendment free speech rights. We agree that unions have “the right under the First Amendment to express their views on political and social issues without government interference.” Knox v. Serv. Empls. Int’l Union, Local 1000, -U.S.-, 132 S.Ct. 2277, 2295, 183 L.Ed.2d 281 (2012).
However, Plaintiff-Appellants’ argument is undercut by three long-standing principles. First, the Supreme Court has stated that “unions have no constitutional entitlement to the fees of non-member employees.” Davenport v. Wash. Educ. Ass’n, 551 U.S. 177, 185, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007). And more relevantly, the First Amendment “protects the right to be free from government abridgement of speech,” but it does not “require[ ]” the government “to assist others in funding the expression of particular ideas, including political ones.” Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 358, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009). Stated another way, “although government may not place obstacles in the path of a person’s exercise of freedom of speech, it *669 need not remove those not of its own creation.” Regan v. Taxation With Representation of Wash., 461 U.S. 540, 549-50, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (internal quotation marks and citations omitted). It may be true that the Union “does not have money as it wants, and thus cannot exercise its freedom as it would like,” but “the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.” Id. at 550, 103 S.Ct. 1997 (internal quotation marks and citations omitted). “A legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right, and is thus not subject to strict scrutiny.” Ysursa, 555 U.S. at 358, 129 S.Ct. 1093 (internal quotation marks and citations omitted).
The Union does not assert that the Indiana state legislature has taken away an asset to which the Union was constitutionally entitled. Viewed in the best possible light, its argument is that Indiana has made it more difficult for the Union to collect as many funds as it is used to collecting. But Indiana, like the state of Idaho in Ysursa, is “under no obligation to aid the unions in their political activities. And the State’s decision not to do so is not an abridgement of the unions’ speech; they are free to engage in such speech as they see fit.” Id. at 359, 129 S.Ct. 1093.
Lastly, as underscored a recent case concerning whether non-union public employees could be compelled to pay agency fees to a state-designated union, the Supreme Court has held that there is a competing First Amendment interest at play with free-rider arguments of this variety: “the First Amendment interests of those ... who do not wish to support the union.” Harris v. Quinn, — U.S.-, 134 S.Ct. 2618, 2643, 189 L.Ed.2d 620 (2014). It reaffirmed that “[a]gency-fee provisions unquestionably impose a heavy burden on the First Amendment interests of objecting employees.” Id. And “free-rider arguments ... are generally insufficient to overcome First Amendment objections.” Id. at 2657.
In passing its right-to-work legislation, Indiana did not abridge the Union’s speech, and thus did not violate its First Amendment right to free speech. Rational basis review is proper for this equal protection claim.
ii. Fundamental Right of Union Membership
Appellants’ weaker argument is the assertion that there exists a fundamental right .of union membership. “Collective bargaining is not a fundamental right,” and a union and its members “are not suspect classes.” Univ. Prof'ls of Ill., Local 4100 v. Edgar, 114 F.3d 665, 667 (7th Cir.1997); see also City of Charlotte v. Local 660, Int’l Ass’n of Firefighters, 426 U.S. 283, 286, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976) (“[T]his court would reject such a contention if it were made that respondents’ status as union members ... is such as to entitle them to special treatment under the Equal Protection Clause.... ”). Since we agree with the Tenth Circuit’s assertion that “neither union nor non-union status implicates a fundamental right or constitutes a protected class,” Local 514 v. Keating, 358 F.3d 743, 754 (10th Cir.2004), we opt for rational basis review unless Plaintiff-Appellants can assert a cognizable fundamental right that has been violated by the Indiana statute.
Plaintiff-Appellants claim that they never asserted that union members are a suspect class. Instead, they try to cobble a brand new fundamental right to union membership out of the fact that union membership implicates the First Amendment rights of freedom of assembly and *670 freedom of association. But besides being intellectually threadbare—consider, for example, that these same facts could be mar-shalled to support a fundamental right to Civil War reenactment—this line of reasoning was rejected by the Supreme Court long ago. Union members in North Carolina and Nebraska made the same argument when they challenged the two states’ right-to-work laws in the late 1940s. They asserted, inter alia, that their freedom of association and assembly was infringed. In Lincoln Federal Labor Union No. 19129, v. Northwestern Iron & Metal Co., the Supreme Court stated:
There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or can not, participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly’s plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly.
335 U.S. 525, 531, 69 S.Ct. 251, 93 L.Ed. 212 (1949).
There is no doubt that union workers enjoy valuable rights of association and assembly that are protected by the First Amendment. See, e.g., Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945). But as in Lincoln Federal, that right alone cannot operate as an offensive weapon to wrest rights from others: here, the Hoosier workers whose rights not to associate with the union are protected by the new legislation. See, e.g., Harris, 134 S.Ct. at 2643 (noting the “First Amendment interests of those ... who do not wish to support the union”); Knox, 132 S.Ct. at 2289 (holding that compelled membership in a public-sector union, which takes positions during collective bargaining that can have powerful civic and political consequences, can “constitute a form of compelled speech and association that imposes a significant impingement on First Amendment rights” (citation and internal quotation marks omitted)). Plaintiff-Appellants must thus make a greater showing: a clear basis for how the laws will “expressly forbid the full exercise of those rights by union or union members,” Lincoln Federal, 335 U.S. at 530, 69 S.Ct. 251, or even a plausible demonstration of how allowing non-union workers to not pay Representation Fees will somehow weaken the bonds of the union’s own association and assembly. They have failed to do so here. Rational basis review is appropriate for this equal protection claim as well.
iii. The Statute Passes Rational Basis Review
Statutes that do not encroach on a fundamental right are reviewed with “considerable deference.” See United States v. Moore, 644 F.3d 553, 555 (7th Cir.2011). The pertinent inquiry is whether the statute in question “bears a reasonable relation to any proper legislative purpose.” Id. at 555-56. It is not our task to discern the specific intent of the legislature, but to determine if any proper legislative purpose is served by Indiana’s law.
The district court’s analysis on this point is apt. As the court stated, “[a] belief that the passage of Right to Work legislation contributes to a business-friend *671 ly environment that can attract companies and encourage job growth provides a legitimate governmental objective that may have been (and was in fact claimed to be) a reason for the passage of Indiana’s Right to Work legislation.” Sweeney, 2013 WL 209047 at *8. We need look no further for a rational basis. The Indiana law does not violate the Plaintiff-Appellants’ right to equal protection.
Ill
We noted at the outset that this legislation prompted vigorous debate, both in the general public and the Indiana Statehouse. But the legislative history and context of the Taft-Hartley Act make clear that the controversy is one that ought to be addressed and resolved at the level of legislative politics, not in the courts. The statutory question posed is whether Indiana’s new law is preempted by federal labor law, or threatens the Union’s First Amendment rights. The answer is an emphatic no. Right>-to-Work laws like Indiana’s have existed since before the passage of the Taft-Hartley Act and the inclusion of Section 14(b) of the NLRA. Congress specifically reserved to the states the power to write and enforce laws of this nature, in accordance with individual states’ needs and wisdom. It is not our province to wrest this authority, which has been intact and undisturbed for over sixty-five years, from the states and erase the distinction between right-to-work states and non-right-to-work states.
For the foregoing reasons, we affirm the district court’s judgment.

. Monica Davey, "Indiana Governor Signs a Law Creating a 'Right to Work’ State,” N.Y. Times (Feb. 2, 2012) at A12, available at http:// www.nytimes. com/2012/02/02/us/ indianabecomes-right-to-work-state.html (last accessed Aug. 20, 2014).

. We briefly note that there is parallel litigation pending in the Indiana state courts. Two decisions have been issued by state trial courts in relation to the statute: in a case in Lake County Superior Court brought by, inter alia, the Plaintiff-Appellants (Order, Sweeney v. Zoeller, No. 45D01-1305-PL-52 (Lake Cnty.Super. Ct. Sep. 9, 2013), Docket No. 23), and in a separate case in Lake County Circuit Court brought by members of an-other union (Order, United Steel Paper v. Zoeller, No. 45C01-1207-PL-00071 (Lake Cnty. Cir. Ct. Jul. 17, 2014)). Both decisions have been appealed to the Indiana Supreme Court. (Docket Records of Zoeller v. Sweeney, No. 45S00-1309—PL—00596 (accessed Aug. 20, 2014); Docket Records of Zoeller v. United Steel Paper, No. 45S00—1407—PL—00492 (accessed Aug. 20, 2014)). The state trial courts’ decisions are far from final in most respects, and, moreover, have no preclusive effect on our consideration of federal questions here.

. The dissent states that Beck should be read for the proposition that the term "membership” does not extend to those who pay only Representation Fees. (We defíne Representation Fees to be those fees germane to collective bargaining, contract administration, and grievance adjustment.) That contradicts Beck's substantive holding. The Court held that § 8(a)(3) "authorizes the exaction of only” Representation Fees, an interpretation that necessarily requires that the term "membership” in that clause be read to mean Representation Fees. 487 U.S. at 762-63, 108 S.Ct. 2641. It is true that in its statement of facts, Beck distinguishes between dues-paying employees "who choose not to be union members” and full dues-paying union members. Id. at 739, 108 S.Ct. 2641. But that quirk is not substantive.

. As this analysis makes clear, our conclusion is compelled in part by Beck 's holding that the term "membership” extends to those who only pay Representation Fees, not simply by the Retail Clerks decisions. And we are bound by that precedent, even if the rule that the term "membership” has been "whittled down to its financial core” to include those who pay only Representation Fees does not fit with the ordinary meaning of the term "membership,” as the dissent states.

. State Laws Regulating Union-Security Contracts, 21 L.R.R.M. 66 (1948). Of these states, ten states retain the same right-to-work statutory language to the present day. The two exceptions are Nevada and Texas. In the case of Nevada, there was a right-to-work provision in effect from 1911 to 1951 in the Crimes and Punishment Act of 1911, which remained in effect until 1951. After a two-year hiatus, a formal, standalone right-to-work law was added in 1953 through initiative petition. Nevada Legislative Counsel Bureau Office of Research Background Paper No. 75-08 (1975). In Texas, a right-to-work law was passed in 1947 and styled Texas Civ.Code § 5207a. It seems to have been updated and re-numbered to appear at Texas Lab.Code § 101 in 1993. The 1993 amendment gave rise to Texas’s specific language that restricted compelled payment of dues and fees to unions.

. The legislative history demonstrates that Congress drafted Section 14(b) to preserve the right-to-work statutes already in effect in 1947. See Int’l Union of the United Ass’n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., Local Unions Nos. 141,229,-681, & 706 v. NLRB, 675 F.2d 1257, 1273 (D.C.Cir.1982) (Mikva, J., dissenting) ("The best evidence of congressional intent may therefore lie in the kinds of 'compulsory unionism’ that members of Congress understood had been banned by the state right-to-work laws.”). Yet the dissent’s position necessarily entails concluding that Congress did not intend § 14(b)’s protections to extend to the majority of right-to-work statutes then in effect. That is not a reasonable interpretation of legislative history.

. National Conference of State Legislatures, "Right-to-Work Resources,” available at http://www.ncsl.org/research/Iabor-and-employment/right-to-work-laws-and-bills.aspx (last accessed Aug. 20, 2014).

.The dissent cites two circuit decisions that stand for the principle that § 14(b) does not authorize states to prohibit the use of exclusive hiring halls that do not discriminate between union members and non members. See Laborers’ Int’l Union of N. Am., Local No. 107 v. Kunco, Inc., 472 F.2d 456 (8th Cir.1973); NLRB v. Houston Chapter, Associated Gen. Contractors of Am., Inc., 349 F.2d 449 (5th Cir.1965). Both decisions precede Beck and did not have the benefit of the Court's interpretation of "membership” in that case. And the D.C. Circuit, in Journeymen & Apprentices, found both cases "clearly distinguishable” from the matter at hand on the basis that these concern pre-hiring practices, whereas § 14(b) applies to post-hiring union security arrangements. Journeymen & Apprentices, 675 F.2d at 1262, 1267 ("Use of a union hiring hall precedes hiring and therefore does not constitute 'membership' under § 14(b).”). We agree that these cases are distinguishable because hiring halls do not *664 require prospective employees to do anything more than temporarily visit union facilities during the hiring process. Such temporary affiliation does not amount to "membership” as that term has been interpreted by the Supreme Court.

. "A controversial issue to which the committee has devoted the most mature deliberation has been the problem posed by compulsory union membership.... [A]buses of compulsory membership have become so numerous there has been great public feeling against such arrangements. This has been reflected by the fact that in 12 States such agreements have been made illegal either by legislative act or constitutional amendment, and in 14 other States proposals for abolishing such contracts are now pending. Although these regulatory measures have not received authoritative interpretation by the Supreme Court (citation omitted) it is obvious that they pose important questions of accommodating Federal and State legislation touching labor relations in industries affecting commerce (citations omitted). In testifying before this committee, however, leaders of organized labor have stressed the fact that in the absence of such provisions many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.” Journeymen & Apprentices, 675 F.2d at 1260 (citing Report of the Senate Committee on Labor and Public Welfare presented by Senator Taft, 80th Cong., 1st Sess. 6, April 17,1947).

. See, e.g., Kris Maher, "Iowa’s House of Labor is Split,” WALL ST. J. (Nov. 20, 2007) at A6 (examining the importance of "big, politically active unions” in the Iowa caucus vote); Steven Greenhouse, "Secret Weapon in Gore Camp: Unions in Iowa,” N.Y. TIMES (Jan. 17, 2000) at A14, available at http:// www.nytimes.eom/2000/01/17/us/th2000- *665 campaign-the-unions-secret-weapon-in-gore-camp-unions-in-iowa.html (calling Iowa’s 150,000-member union force a major "weapon” in the Iowa caucuses) (last accessed Aug. 20, 2014).

. See Hill v. Edmonds, 26 A.D.2d 554, 554-55, 270 N.Y.S.2d 1020 (N.Y.App.Div.1966) ("Where separate acts of negligence combine to produce directly a single injury each tort-feasor is responsible for the entire result, even though his act alone might not have caused it....”).

. In support of our reading, Defendant-Ap-pellees assert the fact that the Indiana Commissioner of Labor has disclaimed any retroactive interpretation of Section 3, but this is not persuasive. While the district court was satisfied by the Commissioner’s declaration, terming it binding under the principles of judicial estoppel, it is difficult to determine what effect such declarations would have on future executive administrations or officeholders. But our reading of the statute convinces us that Section 3 is not retroactive, so we need not rely on the concept of estoppel.