No. 19-0298 – *Patrick Morrisey, West Virginia Attorney General, and The State of West Virginia v. West Virginia AFL-CIO; West Virginia State Building and Construction Trades Council, AFL-CIO; United Mine Workers of America, AFL-CIO; Chauffeurs, Teamsters, and Helpers, Local No. 175; Amanda Gaines; and International Brotherhood of Electrical Workers, AFL-CIO, Locals 141, 307, 317, 466, 596, and 968*

**FILED**
**April 21, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Justice Hutchison, concurring:

The majority opinion presents an analysis of West Virginia's 2016 "right to work" laws that says those laws are constitutional. The law dictates that I must concur because the gist of the majority opinion is true: what the Legislature gives, the Legislature can constitutionally take away. No other court in America has found a right-to-work legislative enactment unconstitutional, and the majority opinion has done nothing different.

Before and after legislatures passed laws to encourage and protect unionization (or, more recently, to discourage unionization), unions fought hard to organize, and they worked diligently to bring collective bargaining to industrial worksites. Their efforts led to dramatic improvements in safety and productivity.[1] Unions pushed employers to give us forty-hour weeks and weekends off, paid vacation and holidays, an eight-hour workday and overtime pay. These benefits paved the way for American workers to become some of the most productive in the world. Unions also fought for Social Security

---

[1] "[U]nions typically play a critical role in educating workers about on-the-job hazards; giving workers incentives to take greater care on the job; attracting more safety-conscious workers; inducing employers to abate known hazards; increasing regulatory scrutiny; and developing safety-related innovations." Alison D. Morantz, *Coal Mine Safety: Do Unions Make a Difference?*, 66 Indus. & Lab. Rel. Rev. 88-89 (2013).

1

and pension benefits, workers' compensation and unemployment insurance. They have pushed for the elimination of gender and racial discrimination. And unions are the reason employers provide health insurance. For over a century, American unions have worked to protect individuals and to ensure workers are not treated as consumable commodities.

To see the effectiveness of union involvement in the protection of workers, one only has look at the decreasing numbers of disasters and deaths in coal mines. The National Institute of Occupational Safety and Health ("NIOSH") compiled a list of coal mine disasters in West Virginia from January 1886 through April 5, 2010.[2] NIOSH defines a "disaster" as an event (like a fire, explosion, roof fall, coal bump, etc.) in which five or more miners die. The last such disaster in West Virginia was at the Upper Big Branch Mine in Montcoal on April 5, 2010 (exactly ten years before my writing of this concurring opinion).

Unions first received significant legal protection when the National Labor Relations Act was passed by Congress in 1935. With much encouragement from the United Mine Workers of America, Congress passed the Mine Safety and Health Act of 1969. West Virginia adopted state protections for unions and workers between 1965 and 1971. This legislation provided fertile ground for unions to flourish.

---

[2] *See* https://www.cdc.gov/niosh/mining/statistics/content/coaldisasters.html (last accessed April 5, 2020).

NIOSH statistics illustrate that as unionization grew in the mines, there was a "sizable and robust decline in both traumatic injuries and fatalities."[3] The statistics show that in West Virginia, from 1886 until 2010, there were a total of 101 coal mining disasters claiming 2,617 lives. Viewed at a more granular level, the statistics show 94 disasters before 1971 – about 1.1 coal mining disasters per year; after 1971 (the year of the last West Virginia enactment) and through 2010, there were only seven coal mining disasters – about .18 per year, which works out to one disaster every five-and-a-half years. The numbers of deaths have also dropped. Between 1886 and 1971, 2,442 miners died in disasters at a rate of 28 per year; in the 39 years from 1971 to 2010, 175 died at a rate of 4.5 per year. Indeed, "unionization is associated with a significant decline in those mine accidents[.]"[4]

While it is a broad simplification to attribute the substantial decrease in loss of life and limb or in the occurrence of coal mining disasters to only union activity, union activity had a substantial impact. Moreover, unions had a substantial impact on correcting

---

[3] Morantz, 66 Indus. & Lab. Rel. Rev. at 99. "[U]nionization predicts a 14 to 32% drop in traumatic injuries and a 29 to 83% drop in fatalities." *Id.* at 89-90. *See also*, Alison Morantz, *Does Unionization Strengthen Regulatory Enforcement? An Empirical Study of the Mine Safety and Health Administration*, 14 N.Y.U. J. Legis. & Pub. Pol'y 697, 702 (2011) ("[T]wo recent studies find that unionization predicts a robust, sizable decline in the frequency of serious mining accidents."); William M. Boal, *The Effect of Unionism on Accidents in U.S. Coal Mining, 1897-1929*, 48 Indus. Rel. J. 97, 117 (2009) ("[U]nionism [between 1897 and 1929] lowered accident fatalities in coal mines by somewhere between 20 and 60 percent, even after controlling for state safety regulations, changes in employer liability, Workers' Compensation, and allegedly dangerous mining techniques like machine mining or 'shooting off the solid.' The effect of unionism on fatalities was equivalent to about five state safety regulations.").

[4] Morantz, 66 Indus. & Lab. Rel. Rev. at 101.

conditions of low wages, unsanitary conditions, child labor, nepotism, and a host of other negative workplace influences.

Unions rose and grew to combat the wrongs that employees faced in the workplace. Right-to-work laws serve to undermine unions, and no matter how optimistic I am, my years as a judge have taught me this: those wrongs will more likely than not rise again. Much like a democracy, only collective action by a majority of the people, working together, can combat wrongs. A house divided against itself will fall.[5]

As the majority opinion relates, Congress passed the National Labor Relations Act in 1935 to protect unions and encourage collective bargaining. In 1947, Congress passed the Taft-Hartley Act to whittle down the very same rights it created in 1935. The Taft-Hartley Act recognized that States could adopt laws to "prohibit employers and unions [from] negotiat[ing] agreements requiring compulsory union membership, or requiring nonunion employees to pay dues or fees to the union."[6] Thus, Congress gave, and Congress took away.

In the same way, the West Virginia Legislature created protections for unions in 1965 and 1971 when it crafted a Labor-Management Relations Act. In 2016, the Legislature passed the right-to-work legislation at issue in this case. As the majority

---

[5] *See Mark* 3:25; *Luke* 11:17.

[6] *Morrisey v. W.Va. AFL-CIO*, 239 W. Va. 633, 640, 804 S.E.2d 883, 890 (2017) ("*Morrisey I*"). *See generally*, 29 U.S.C. § 164(b) (2012).

opinion notes, the 2016 right-to-work laws stripped away many union protections. What the Legislature gave, the Legislature had the power to later take away.

This Court has often said that questions of public policy are within the realm of the Legislature. The guiding rule for any Justice is this:

> This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal *Constitutions*.[7]

Many people in the state of West Virginia might personally disagree with the Legislature's decision to enact a right to work law and question the propriety of the policy propounded by such legislation. However, I do not approach this question as a legislator or as a private citizen. I approach it as a Justice, and as a Justice, I must defer to the decision of legislators, acting together, whom the people elect every two to four years.

I have studied past challenges to right-to-work laws, and I have read countless United States Supreme Court cases and lower federal court cases and state court cases. With almost clarion unity, courts repeatedly hold that legislatures may give rights to unions and can just as quickly take those rights away with constitutional impunity. The *Morrisey I* Court acknowledged as much in 2017, saying that "[t]wenty-seven other states

---

[7] Syllabus Point 2, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009).

5

have adopted right to work laws similar to West Virginia's, and the unions have not shown a single one that has been struck down by an appellate court."[8]  The *Morrisey I* Court hinted that the unions' lawyers needed to come up with better legal arguments.  Having read the work of other courts, at this point I don't think there is a better argument.  I now think the solution lies in the ballot box, not the courtroom.

Having taken a constitutional oath as a Justice, it is my sworn duty to uphold the law.  I am, therefore, compelled by the law and my obligations as a Justice to respectfully concur with the majority opinion.

---

[8] *Morrisey I*, 239 W. Va. at 639, 804 S.E.2d at 889.