# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

_____

No. 17-0187

_____

FILED

**September 15, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**PATRICK MORRISEY, in his official capacity
as West Virginia Attorney General, and
THE STATE OF WEST VIRGINIA,**
Defendants Below, Petitioners

v.

**WEST VIRGINIA AFL-CIO, et al.,**
Plaintiffs Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action No. 16-C-959-969

**REVERSED AND REMANDED**

_____

Submitted: September 5, 2017
Filed: September 15, 2017

Patrick Morrisey
Attorney General
Elbert Lin
Solicitor General
Thomas M. Johnson, Jr.
Deputy Solicitor General
Gilbert Dickey
Assistant Attorney General
Charleston, West Virginia
Counsel for the Petitioners

Vincent Trivelli, Esq.
The Law Office of Vincent Trivelli
Morgantown, West Virginia
Robert M. Bastress, Jr., Esq.
Morgantown, West Virginia
Counsel for the Respondents

Matthew B. Gilliam, Esq.
National Right to Work Legal Defense
Foundation, Inc.
Springfield, Virginia
Counsel for Amici Curiae National
Right to Work Legal Defense and
Education Foundation, Inc., and
Reginald Gibbs

Derk A. Wilcox, Esq.
Mackinac Center for Public Policy
Mackinac Center Legal Foundation
Midland, Michigan
Danielle Waltz, Esq.
Jackson Kelly PLLC
Charleston, West Virginia
Counsel for Amicus Curiae Mackinac
Center for Public Policy

John D. Hoblitzell, III, Esq.
Kay Casto & Chaney, PLLC
Charleston, West Virginia
Counsel for The Honorable James C.
Justice, in his Official Capacity as
Governor of the State of West Virginia

Maneesh Sharma, Esq.
Washington, District of Columbia
Thomas P. Maroney, Esq.
Maroney Williams Weaver & Pancake
PLLC
Charleston, West Virginia
Counsel for Amicus Curiae American
Federation of Labor and Congress of
Industrial Organizations

Jeffrey G. Blaydes, Esq.
Carbone & Blaydes, P.L.L.C.
Charleston, West Virginia
Counsel for Amici Curiae West
Virginia Employment Law Association
and West Virginia Association for
Justice

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**CHIEF JUSTICE LOUGHRY concurs and reserves the right to file a separate Opinion.**

**JUSTICE DAVIS dissents and reserves the right to file a separate Opinion.**

**JUSTICE WORKMAN concurs, in part, and dissents, in part, and reserves the right to file a separate Opinion.**

**SYLLABUS BY THE COURT**

"This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal *Constitutions*." Syllabus Point 2, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 679 S.E.2d 323 (2009).

Justice Ketchum:

In this appeal, we examine a preliminary injunction issued by the Circuit Court of Kanawha County that stopped the implementation of West Virginia's new "right to work" law. In limited circumstances, a circuit court may issue a preliminary injunction when the plaintiff shows that his or her lawsuit is likely to succeed on its merits.

The plaintiffs in this case are several unions. The gist of their argument is that the right to work law is unconstitutional because it is unfair to unions and union members. The defendants are officials for the State of West Virginia. Their argument is that the law is fair because it protects workers who do not want to join or pay dues to a union.

Whether a law is fair or unfair is not a question for the judicial branch of government. Courts cannot dwell "upon the political, social, economic or scientific merits of statutes[.]"[1] The wisdom, desirability, and fairness of a law are political questions to be resolved in the Legislature. Those decisions may only be challenged in the court of public opinion and the ballot box, not before the judiciary. Our duty boils down to weighing whether the preliminary injunction was proper, and whether the unions showed they are likely to prevail in their ultimate claim that the law is unconstitutional.

As we discuss below, we find that the unions failed to show a likelihood of success in their legal challenge to the law's constitutionality. Twenty-eight states,

---

[1] Syllabus Point 2, in part, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 725, 679 S.E.2d 323, 324 (2009).

1

including West Virginia, have a right to work law, yet the unions have not directed us to any federal or state appellate court that, in over seven decades, has struck down such a law. Therefore, the circuit court erred in granting the preliminary injunction.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

This appeal concerns a preliminary injunction temporarily halting the implementation of provisions in Senate Bill 1, enacted in the 2016 Regular Session of the West Virginia Legislature.[2] The Legislature euphemistically titled Senate Bill 1 as the "Workplace Freedom Act," and in the same way calls it a "right to work" law.

Similar to right to work laws adopted in twenty-seven other states, Senate Bill 1 amends West Virginia's labor relations laws to change the way unions represent employees in a workplace.[3] First, the bill prohibits a union and an employer from entering a collective bargaining agreement that compels all employees to join the union. Second, the bill eliminates a union's ability to compel nonunion employees to pay any dues, fees, or assessments, of any kind, in exchange for the union's assistance. Nevertheless, when a union assumes representation of a workplace, other federal and state laws require the union to fairly represent all employees in the workplace, even employees who are not union members and have paid no fees to the union.

___

[2] *See 2016 Acts of the Legislature*, ch. 142.

[3] *See generally*, W.Va. Code §§ 21-5G-1 to -7 [2016]. We discuss the bill in detail in the discussion below.

The plaintiffs are several unions who sued various officers of the State of West Virginia to challenge the enforceability of Senate Bill 1.[4] The unions' complaint asserted a hodgepodge of theories.

However, the unions raised three constitutional claims as the basis for seeking a preliminary injunction. The unions maintained that Senate Bill 1 violates the West Virginia Constitution because it impairs the associational rights of unions to consult for the common good; it takes the unions' property without just compensation; and it violates the unions' liberty interests, by requiring unions to expend their labor for nonunion employees without the ability to charge a fee for that labor. The unions argued that, if the law took effect, the unions would be harmed because they would be unable to bargain for compulsory membership and fees in new collective bargaining agreements without potentially violating the law. The unions asked the circuit court to halt implementation of Senate Bill 1 until the merits of the unions' complaint could be resolved.

---

[4] The plaintiffs are the West Virginia AFL-CIO; the West Virginia State Building and Construction Trades Council, AFL-CIO; the Chauffeurs, Teamsters, and Helpers Local No. 175; the United Mine Workers of America, AFL-CIO; and the International Brotherhood of Electrical Workers, AFL-CIO, Locals 141, 307, 317, 466, 596, and 968; and Amanda Gaines, a union member. The defendants included the Governor of the State of West Virginia, originally Earl Ray Tomblin, who was succeeded in January 2017 by James C. Justice; and the Attorney General, Patrick Morrisey. The State of West Virginia subsequently intervened in the suit.

In an order dated February 24, 2017, the circuit court imposed a preliminary injunction. The circuit court ruled that the provisions of Senate Bill 1 would not go into effect until the circuit court ruled on the merits of the unions' arguments.

The State now appeals the circuit court's preliminary injunction order.

## II.
## STANDARD OF REVIEW

The granting or refusal of an injunction calls for a circuit court to exercise judicial discretion. We apply a three-pronged deferential review to the circuit court's decision. "We review the final order granting the [preliminary] injunction and the ultimate disposition under an abuse of discretion standard, we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo."[5]

## III.
## ANALYSIS

A fundamental rule of governance is that courts must presume a law is constitutional unless a party proves, beyond a reasonable doubt, that the law violates the Constitution.[6]

---

[5] Syllabus Point 1, in part, *State by and through McGraw v. Imperial Marketing,* 196 W.Va. 346, 472 S.E.2d 792 (1996) (citations omitted).

[6] Syllabus Point 2, in part, *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 454 S.E.2d 65 (1994) ("Acts of the Legislature are presumed to be constitutional, and

Continued . . .

4

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.[7]

To ultimately succeed in this case, the unions must show beyond reasonable doubt that Senate Bill 1 violates constitutional bounds. Challenges to the constitutionality of a law cannot be made lightly and without concerted, focused effort. Indeed, "One who attacks a statute on constitutional grounds, defended as that statute is by a strong presumption of constitutionality, should bring up his heavy artillery or forego the attack entirely."[8]

The unions sought and received a preliminary injunction based upon their constitutional attack upon Senate Bill 1. For many decades, West Virginia courts have applied the following guide when granting or refusing an injunction:

---

courts will interpret legislation in any reasonable way which will sustain its constitutionality."); *State ex rel. City of Charleston v. Coghill*, 156 W.Va. 877, 883, 207 S.E.2d 113, 118 (1973) (same).

[7] Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965).

[8] *Southern Valley Grain Dealers Ass'n v. Bd. of Cty. Comm'rs of Richland Cty.*, 257 N.W.2d 425, 434 (N.D. 1977).

The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.[9]

The central core of this decades-old analysis is the "comparative hardship" of the parties. The federal courts have evolved a detailed methodology to guide courts in balancing the hardship of the parties. West Virginia trial courts apply this same four-factor methodology when weighing the granting or refusal of a preliminary injunction:

Under the balance of hardship test the district court must consider, in 'flexible interplay,' the following four factors in determining whether to issue a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) *the plaintiff's likelihood of success on the merits*; and (4) the public interest.[10]

In this appeal, the State's arguments center upon the third factor: the unions' likelihood of success on the merits of their constitutional arguments. The State argues on appeal that the constitutional claims advanced by the unions have been tested before in other courts and rejected. Twenty-seven other states have adopted right to work laws similar to West Virginia's, and the unions have not shown a single one that has been

---

[9] Syllabus Point 4, *State ex rel. Donley v. Baker*, 112 W.Va. 263, 164 S.E. 154 (1932).

[10] *Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 183 W.Va. 15, 24, 393 S.E.2d 653, 662 (1990) (emphasis added) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1054 (4th Cir. 1985)).

struck down by an appellate court. Moreover, the unions did not plainly articulate to the circuit court which provision of the West Virginia Constitution provides, beyond a reasonable doubt, that a right-to-work law is improper. Because the unions did not demonstrate a likelihood of success, the State argues the circuit court should not have granted a preliminary injunction. We agree.

Congress enacted the National Labor Relations Act[11] (also called the "Wagner Act") in 1935 to protect the rights of employees and employers, and to encourage collective bargaining. Congress amended it through the Labor Management Relations Act of 1947, better known as the "Taft-Hartley Act." Section 8(a)(3) of the Taft-Hartley Act prohibited a "closed shop," a union security agreement whereby an employer agreed to employ only union members.[12] Section 8(a)(3) still permitted "less severe forms of union-security arrangements" such as a union-employer agreement "requiring nonunion members to pay to the union $2 a month 'for the support of the

---

[11] 29 U.S.C. §§ 151-169.

[12] Section 8(a)(3) is codified at 29 U.S.C. § 158(a)(3) [1979].

bargaining unit.'"[13]  It also permitted a workplace where the employer was free to hire

anyone, but could require new employees to join the union after they were hired.[14]

Although Section 8(a)(3) of the Taft-Hartley Act permitted the adoption of

such less restrictive union-security agreements, a provision of the Act also left states free

to ban them altogether.  Section 14(b) of the Act creates an exception to Section 8(a)(3),

and provides that states may pass laws that prohibit "agreements requiring membership in

a labor organization as a condition of employment[.]"[15]  The United States Supreme Court

has examined the interplay between Section 8(a)(3) and Section 14(b) and found that

"Congress left the States free to legislate" and adopt laws "restricting the execution and

---

[13] *N.L.R.B. v. Gen. Motors Corp.*, 373 U.S. 734, 739-40 (1963).  Section 8(a)(3) provides that nothing "shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein[.]"  29 U.S.C. § 158(a)(3).

[14] *Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U. S. & Canada, Local Unions Nos. 141, 229, 681, & 706 v. N. L. R. B.*, 675 F.2d 1257, 1266-1269 (D.C. Cir. 1982) (Mikva, J. dissenting).

[15] Section 14(b), codified at 29 U.S.C. § 164(b) [1959], provides:

(b) *Agreements requiring union membership in violation of State law*. Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

8

enforcement of union-security agreements," and even free to go so far as to "outlaw" a union-security arrangement.[16]

When Congress passed Section 14(b) of the Taft-Hartley Act in 1947, twelve states had right-to-work laws.[17] "These laws fell into two different categories. The first broadly disallowed compulsory union membership. The second included specific provisions outlawing compulsory payment of dues or fees to labor organizations."[18] "Congress knew precisely what state laws it was validating when it passed § 14(b). The House [of Representatives'] report listed each state which had passed a right-to-work law or constitutional provision."[19] The clear purpose of Section 14(b) "was to preserve the efficacy of laws like these – statutes that allowed states to place restrictions of their choosing on union-security agreements[.]"[20]

In sum, under federal law, states may decide whether to allow or prohibit employers and unions to negotiate agreements requiring compulsory union membership, or requiring nonunion employees to pay dues or fees to the union.

---

[16] *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102-03 (1963). *See also United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin Cty., Kentucky*, 842 F.3d 407, 417 (6th Cir. 2016) ("state" in § 14(b) includes political subdivisions).

[17] *Int'l Union of Operating Engineers Local 370 v. Wasden*, 217 F.Supp.3d 1209, 1221 (D. Idaho 2016).

[18] *Sweeney v. Pence*, 767 F.3d 654, 662 (7th Cir. 2014).

[19] *Int'l Union of the Plumbing and Pipefitting Indus.*, 675 F.2d at 1260.

[20] *Sweeney*, 767 F.3d at 663.

9

In Senate Bill 1, the West Virginia Legislature chose to prohibit both compulsory union membership and compulsory dues for union representation. The bill provides that an employee may not be compelled,

> as a condition or continuation of employment, to:
>
> > (1) Become or remain a member of a labor organization;
> >
> > (2) Pay any dues, fees, assessments or other similar charges, however denominated, of any kind or amount to any labor organization; or
> >
> > (3) Pay any charity or third party, in lieu of those payments, any amount that is equivalent to or a pro rata portion of dues, fees, assessments or other charges required of members of a labor organization.[21]

The bill goes on to declare as "unlawful, null and void, and of no legal effect" any agreement between a labor organization and an employer that requires membership in the organization,[22] and imposes criminal and civil penalties for the adoption of such an agreement.[23]

In the unions' complaint for relief and request for a preliminary injunction, the unions offered the aforementioned three arguments why Senate Bill 1 is unconstitutional. The State counters that the unions have not demonstrated a likelihood of success on the constitutional arguments they have so far advanced. Hence, the State

---

[21] W.Va. Code § 21-5G-2 [2016].

[22] W.Va. Code § 21-5G-3 [2016].

[23] W.Va. Code §§ 21-5G-4 and -5 [2016].

argues that the circuit court abused its discretion in granting the preliminary injunction. We therefore must examine the three constitutional arguments thus far proffered by the unions.

The unions first argue that Senate Bill 1 violates their constitutional right to freedom of association under the West Virginia Constitution.[24] The unions contend that the bill is unconstitutional because it impairs their ability to associate with employees to advance workers' causes.

"There is no doubt that union workers enjoy valuable rights of association and assembly that are protected by the First Amendment."[25] However, we see nothing in Senate Bill 1 that prevents a person from making a voluntary choice to associate with a union or to pay union dues. Additionally, the constitutional freedom of association argument proffered by the unions is nearly identical to one rejected by the United States Supreme Court almost seven decades ago. The Supreme Court stated:

> The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that

---

[24] The unions base their argument on two constitutional provisions. Article III, § 16 of the West Virginia Constitution provides, "The right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances, shall be held inviolate." Article III, § 7, provides in part, "No law abridging the freedom of speech, or of the press, shall be passed[.]"

[25] *Sweeney*, 767 F.3d at 670.

> none shall get and hold jobs except those who will join in the
> assembly or will agree to abide by the assembly's plans.[26]

The Supreme Court plainly held that the constitutional right to assemble and associate does not entitle a union to compel nonmembers to "participate in union assemblies" as a condition of employment.[27] Likewise, "unions have no constitutional entitlement [under the First Amendment] to the fees of nonmember-employees."[28]

We find no fault with the unions' assertion that membership and dues are the lifeblood of any labor organization. We also find no fault with the State's contention that, just as there is a right for employees and unions to associate, there is a right to not associate.[29] The question we must decide is whether the unions have shown a likelihood of success in pressing their argument that Senate Bill 1 is unconstitutional because it impairs their freedom of association. At least twenty-seven other states have some form of a right to work law today, many in existence since the passage of the Taft-Hartley Act in 1947. The unions have not directed us to any state or federal appellate decision accepting their constitutional freedom of association argument and disapproving of a right to work law on similar grounds.

---

[26] *Lincoln Fed. Labor Union No. 19129, A.F. of L. v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531 (1949).

[27] *Id.*

[28] *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 185 (2007) (citing *Lincoln Fed. Labor Union*, 335 U.S. at 529-531).

[29] *Adkins v. Miller*, 187 W.Va. 774, 777, 421 S.E.2d 682, 685 (1992) (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 (1990)).

Put simply, the unions have not established a likelihood that they will ultimately succeed on their contention that Senate Bill 1 violates their constitutional right of association beyond a reasonable doubt.

The second constitutional argument proffered by the unions is that Senate Bill 1 is an unconstitutional taking of union property. Federal and state law requires unions to provide equal services and representation to all employees who are members of a collective bargaining unit.[30] It costs a union money to negotiate, administer and enforce an agreement with an employer. The unions argue that a state law prohibiting the union from collecting fees from nonmembers, while the law requires the union to provide equal services to these "free riders," effects an unconstitutional taking of property.[31]

The State contends that a unilateral expectation of fees is not a constitutionally protected property right. For purposes of due process challenges, "A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a

---

[30] *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202-03 (1944) (The Railway Labor Act "expresses the aim of Congress to impose on the bargaining representative . . . the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them."). *See also Ford Motor Co. v. Huffman*, 345 U.S. 330, 337-38 (1953) (extending duty of fair representation to the NLRA); 29 U.S.C. § 159 ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees . . . shall be the exclusive representatives of all the employees[.]"; and W.Va. Code § 21-1A-5(a) (same).

[31] W.Va. Const., Article III, § 9 ("Private property shall not be taken or damaged for public use without just compensation.")

13

legitimate claim of entitlement under existing rules or understandings."[32] "A 'property' interest protected by due process must derive from private contract or state law, and *must be more than [a] unilateral expectation. . . .*"[33]

These due process guides are instructive in the context of the alleged taking of a property interest. In the absence of a collective bargaining agreement, unions have only a "unilateral expectation" of receiving fees from nonunion employees. Prior to the passage of Senate Bill 1, unions could only speculate whether they would be able to negotiate new agreements with employers that would require the collection of fees from nonunion employees. The formation of a collective bargaining agreement with a fee-collection provision was contingent upon the consent of a third party: the employer. Hence, in the absence of an actual collective bargaining agreement, the unions have only a unilateral expectation that they will receive fees from nonunion employees. Senate Bill 1 does not affect existing contracts; it affects only future agreements that unions and employers have not yet negotiated or accepted. The unions therefore have no protected property right that the Legislature has taken through the adoption of Senate Bill 1.

Moreover, the unions have offered no authority that any other appellate court in this country has examined a taking challenge to a right to work law and accepted

---

[32] Syllabus Point 3, *Waite v. Civil Serv. Comm'n*, 161 W.Va. 154, 241 S.E.2d 164 (1977) (*overruled on other grounds by W.Va. Dep't of Educ. v. McGraw*, 239 W.Va. 192, 800 S.E.2d 230 (2017)).

[33] Syllabus Point 3, in part, *Orteza v. Monongalia Cty. Gen. Hosp.*, 173 W.Va. 461, 318 S.E.2d 40 (1984) (emphasis added).

a similar argument. Hence, we cannot say that the union demonstrated a likelihood of success on their claim that Senate Bill 1, beyond a reasonable doubt, is an unconstitutional taking of union property.

The unions' third and final argument – set forth in a single paragraph – is that Senate Bill 1 deprives them of their liberty interest in their labors. The unions assert that the Constitution safeguards individual "liberty," a concept that includes "the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator" and "the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation."[34] The unions then state that Senate Bill 1 will require unions and union officials to work for nothing, thereby contravening their liberty interest.

The unions failed to develop their legal argument as to how Senate Bill 1 violates a liberty interest under the West Virginia Constitution. This Court routinely rejects skeletal arguments like that offered by the unions.[35] Nevertheless, as with the unions' other two constitutional claims, the union has failed to show that any other appellate court in this country has adopted a similar argument to strike down a similar right to work law. Hence, on the grounds offered by the unions, we are not persuaded

_____

[34] *Lawrence v. Barlow*, 77 W.Va. 289, 292, 87 S.E. 380, 381 (1915).

[35] *See State, Dept. of Health v. Robert Morris N.,* 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995).

15

that they established a likelihood of success on their claim that Senate Bill 1 violated their liberty interests.

In the absence of a likelihood of success on the merits, the circuit court abused its discretion when it granted the unions' request for a preliminary injunction. The circuit court's order must be reversed and the case remanded for final resolution.

## IV.
## CONCLUSION

The unions failed to establish a likelihood of success on the merits of their three constitutional claims. The circuit court therefore abused its discretion in granting a preliminary injunction. The circuit court's February 24, 2017, order is therefore reversed, the preliminary injunction dissolved, and the case remanded for the circuit court to conduct a final hearing on the merits of the parties' various contentions.[36]

Reversed and remanded.

---

[36] The record indicates the plaintiffs filed their request for a preliminary injunction on June 27, 2016, four days before Senate Bill 1 took effect on July 1, 2016. A hearing on the request was held on August 10, 2016, and a proposed order was submitted to the circuit court on August 19, 2016. The circuit court only entered the proposed order five months later, on February 24, 2017, after the Attorney General threatened to seek mandamus relief from this Court. Because of the far-reaching effect of Senate Bill 1 and its potentially substantial impact upon public interests, in the future, we encourage the circuit court to act with greater celerity in bringing this case to a resolution.