No. 19-0298 - *Patrick Morrisey, West Virginia Attorney General, and The State of West Virginia v. West Virginia AFL-CIO; West Virginia State Building and Construction Trades Council, AFL-CIO; United Mine Workers of America, AFL-CIO; Chauffeurs, Teamsters, and Helpers, Local No. 175; Amanda Gaines; and International Brotherhood of Electrical Workers, AFL-CIO, Locals 141, 307, 317, 466, 596, and 968.*

**FILED**
**April 21, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Justice Workman, concurring and dissenting:

I reluctantly concur in the judgment of the Court, as I believe that the result in this case is compelled by the recent decision of the United States Supreme Court in *Janus v. American Federation of State, County, and Municipal Employees Council*, __ U.S. __, 138 S.Ct. 2448 (2018). Given my judicial colleagues' refusal to give more than a cursory nod to our unbroken line of precedents permitting -- and sometimes requiring -- us to "interpret [the West Virginia] Constitution to require higher standards of protection than afforded by comparable federal constitutional standards," *Pauley v. Kelly*, 162 W. Va. 672, 679, 255 S.E.2d 859, 864 (1979) (internal citation omitted),[1] it is inevitable that any decision striking down the agency fee ban contained in W. Va. Code § 21-1A-3 would last only as long as it took for the petitioners herein to file a petition for writ of certiorari.

---

[1] The majority concludes that the petitioners have presented "no grounds for heightened protections," apparently finding all of petitioners' arguments made both below and in this Court to be without constitutional substance. Additionally, the majority cavalierly discounts the application of *Pauley* and its progeny by emphasizing (both literally and figuratively) that provisions of our Constitution "*may, in certain instances*, require higher standards of protection than afforded by the Federal Constitution." *Pauley*, Syl. Pt. 2, in part. Presumably, a case involving the protection of West Virginia workers' hard-won right to engage in collective bargaining presents no such "instance."

1

Make no mistake about it: I believe that the carefully crafted decision of the circuit court was absolutely correct in its associational rights and takings analyses[2] – absolutely correct at the time it was written, in a pre-*Janus* world. I believe that *Janus* was wrongly decided, and I join wholeheartedly in the legal analysis set forth in the dissenting opinion by Justice Kagan on behalf of herself and Justices Ginsburg, Breyer, and Sotomayor. However, I also believe that although *Janus* was a decision involving only public employees' unions, you don't need a weatherman to know which way the wind blows;[3] there is no principled basis on which to conclude that under the legal analysis upon which *Janus* is based, a prohibition on the collection of agency fees is constitutional for public employees' unions but unconstitutional for private employees' unions. *See, e.g., Zuckerman v. Bevin*, 565 S.W.3d 580, 602 (Ky. 2018) ("the Supreme Court's analysis of the 'free rider problem' in its recent decision in *Janus* … conclusively refutes, for several reasons, the Unions' claim that they will be compelled to provide services without compensation.").

---

[2] I am less convinced by the court's very brief liberty interest analysis, perhaps because the jurisprudential concept of liberty interest has become a moving target in cases involving hot-button issues. At a time when naked partisan politics seem to be seeping – nay, gushing – into the fabric of the judiciary, one judge's "liberty interest" is another judge's "legalistic argle bargle." *U. S. v. Windsor*, 570 U.S. 744, 799, 133 S.Ct. 2695, 2709 (2013) (Scalia, J., dissenting). Additionally, my reading of the petitioners' arguments is that their constitutional underpinning is more congruent with concepts of substantive due process than with the more elusive concepts of liberty interest, *see State ex rel. Harris v. Calendine,* 160 W. Va. 172, 179, 233 S.E.2d 318, 324 (1977) ("Inherent in the due process clause of the State Constitution are both the concept of substantive due process and the concept of equal protection of the laws. In order for the statutory scheme … to withstand constitutional scrutiny under the substantive due process standard, it must appear that the means chosen by the Legislature to achieve a proper legislative purpose bear a rational relationship to that purpose and are not arbitrary or discriminatory.") (footnotes omitted). However, petitioners have not squarely addressed a substantive due process issue and "'[w]e have noted on many occasions that "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.' *State v. Lilly,* 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995)." *State v. Lambert*, 236 W. Va. 80, 89 n.12, 777 S.E.2d 649, 658 n.12 (2015).

[3] Bob Dylan, *Subterranean Homesick Blues* (1965).

I join in Justice Hutchison's separate opinion, wherein he writes convincingly of the benefits of unionization in this state and this country. I am not as sanguine as he, however, that the role of the judiciary is so limited that it can be summed up in the artfully coined phrase, "what the Legislature gives, the Legislature can constitutionally take away." It cannot be gainsaid that on numerous occasions, the Legislature has been mindful of politics and careless of the Constitution in enacting certain laws; and on those occasions, this Court has not hesitated to fulfill its role in our tripartite system of government by invalidating such laws. The fact that I do not believe we can invalidate W. Va. Code § 21-1A-3, due to the constraints placed on us by the constitutional analysis contained in the *Janus* opinion, does not signal my willingness to have the judicial branch of government simply "knuckle down" to the legislative branch. Our review of legislative enactments is highly deferential, *see, e.g.*, Syl. Pt. 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965);[4] however,

> [t]he system of 'checks and balances' provided for in American state and federal constitutions and secured to each branch of government by 'Separation of Powers' clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch.

*Louk v. Cormier*, 218 W. Va. 81, 88, 622 S.E.2d 788, 795 (2005) (internal citations omitted).

---

[4] "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt."

I choose to write separately from Justice Hutchison because I do not, and cannot, concur in much of the majority's reasoning, notwithstanding my acceptance of its judgment.[5] As then-Justice Davis cogently wrote in her dissenting opinion in *Morrissey v. West Virginia AFL-CIO [Morrisey I]*, 239 W. Va. 633, 649 n.1, 804 S.E.2d 883, 899 n.1 (2017), the majority

> demonstrates an inordinate lack of comprehension of basic tenets of labor law: the election of an exclusive union representative is a matter of necessity, not of choice. But for the existence of an exclusive union representative to facilitate negotiations, *there would be no collective bargaining agreement* to reconcile and govern the often divergent and discordant interests of employers and employees in the first instance, and the entire statutory scheme at issue herein, which seeks to regulate such union activities, would be a mere nullity.

(Emphasis supplied.) I fear that this is the ultimate outcome of what seems to be a mad rush in state legislatures, including our own, to choke off the lifeblood of labor unions: the funds necessary for the union to bring the employer to the table, to bargain on behalf of employees, to administer any contract resulting from that bargaining, and to represent employees – members and non-members alike – in grievances and disciplinary matters.

It is telling that the majority begins its analysis by quoting extensively from remarks made more than seventy years ago by Robert A. Taft, a fierce opponent of the New Deal who decried what he saw as "the consistently pro-labor attitude of the Executive [and] pro-labor

---

[5] In this regard, at the outset "[i]t should be clearly understood that in expressing my dissentient views, however, in this honest and sincere disagreement between my associates and me, my criticisms are directed, not to them, but to their direction." *Lance v. Board of Educ. of Cnty. of Roane,* 153 W.Va. 559, 574, 170 S.E.2d 783, 791 (1969) (Haymond, J., dissenting).

interpretations [of the courts]."[6] To the extent that Senator Taft's observations were valid in the 1940's, which may be debated,[7] the pendulum has now swung so far in the other direction that these comments seem a quaint throwback to another era. Anti-union sentiment in the executive, the judicial, and the legislative branches of government is now pervasive; as noted by the majority, with the passage in 2016 of the precursor to the current Workplace Freedom Act, W. Va. Code §§ 21-1A-1 – 8, West Virginia became the 26th jurisdiction to enact right-to-work laws, thus joining in the inexorable march of the states toward eradication of labor unions as a force in the American economy.

And it is beyond the pale of reasoned disagreement that this is exactly what the West Virginia Legislature intended to do when it enacted a right-to-work law, and specifically when it enacted W. Va. Code § 21-1A-3, requiring unions to fulfill all of their existing duties to non-members – to represent their interests in contract negotiations, to represent their interests in all matters arising from administration of a collective bargaining agreement, and to represent them in grievance, disciplinary or termination appeals -- without compensation. Evidence adduced in the proceedings below demonstrated that union membership can be expected to decline significantly as workers realize they can enjoy all the benefits of union membership without paying for those

---

[6] Robert A. Taft, *Forward* to Fred A. Hartley, Jr., *Our New National Labor Policy, The Taft-Hartley Act and the Next Steps*, at xii (1948), quoted in full in the majority's opinion at pp. 3-4.

[7] As one legal scholar has noted, the "problem" which was "solved," at least in part, by the Taft-Hartley Act, was "that both unionism (the situation in which a firm's employees are represented by a union for collective bargaining purposes), and certain specific events associated with unionism, reduce shareholder wealth (the value of shareholders' claims to firm profits as measured by security returns)." Steven E. Abraham, *How the Taft-Hartley Act Hindered Unions*, 12 Hofstra Labor and Employment Law Journal 1, 2 (1994).

benefits, what one jurist has called "a classic 'free-rider' problem." *Sweeney v. Pence,* 767 F.3d 654, 673 (2014) (Wood, J., dissenting).[8] *See generally* Abraham, *supra* at 30-31:

> Section 14(b) has generated a great deal of empirical work by researchers who have attempted to determine the impact of [right to work] laws on various union outcomes. Many of these studies find that RTW laws have a negative effect on the level of unionization in the states possessing them; the studies also suggest that RTW laws negatively impact state wage levels. These studies generally conclude that the statistics cited demonstrate that RTW laws reduce unionization by increasing union organizing and maintenance costs given the existence of 'free riders' in the bargaining unit, and/or decrease the bargaining power of unions – bargaining power being theoretically linked both to unanimity of support by organized employees and to the percent organized.

Much of what the majority has to say in today's opinion exposes the political philosophy that informs it: clearly, three members of this Court believe that W. Va. Code § 21-1A-3 was enacted for a beneficial purpose, and posit that its enforcement will do no harm to the unions' ability to represent the interests of union members and non-members alike. I cannot agree. First, the petitioners in this case put not one scintilla of evidence into the record on this or any other point; the entirety of the majority's recitation of the supposed "benefits" inuring to a union are lifted wholesale from other courts' decisions in other cases.[9] And some of the pronouncements in those decisions are, to put it mildly, overblown, *i.e.,* "[t]he powers of the bargaining representative are 'comparable to those possessed by a legislative body both to create and restrict

---

[8] "If there is no way to compel the nonmember employee to pay the actual cost of the service the union is obligated to provide for him, a classic 'free-rider' problem arises … In our situation, the nonmember of the union will reap the benefits of being represented b the union during a grievance, for instance, but he will pay nothing for those benefits, which might include a lay representative, maybe even a lawyer, investigative services, and so on – all things that cost the union real dollars to provide. In short, he will take a 'free ride' on the dues that the union members make to the union."

[9] For example, there is no evidence as to whether any or all of the respondent unions and/or their locals have successfully bargained to have fees and dues deducted directly from wages; nonetheless, the majority lists this as a "benefit" that can be counted as "compensation" for purpose of a takings analysis.

the rights of those whom it represents.'"  *Sweeney*, 767 F.3d at 666, citing *Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944).  In extricating this snippet of language from its context, the *Sweeney* court engaged in some legal sleight-of-hand, since in *Steele*, the point the Court was making was that just as Congress is constrained by the fourteenth amendment from enacting racially discriminatory laws, so too are unions constrained from refusing to negotiate on behalf of African Americans in the workplace.  This is a far cry from holding – or, indeed, even suggesting -- that unions have near-plenary powers equivalent to those of a state legislature.

Second, my research has not disclosed one single case containing a persuasive argument that protecting the rights of free riders[10] to enjoy the benefits of union representation – chief among them the ability to force the employer to the table for negotiation concerning pay, benefits, and conditions of employment – without paying for them, serves any purpose other than to effect a stranglehold on unions' ability to provide those services.  As Justice Hutchison notes in his concurring opinion, laws such as the one at issue here were enacted to discourage unionization and undermine existing unions, just as the Taft-Hartley Act[11] was enacted in 1947 for the express purpose of undermining many of the rights created in 1935 in the National Labor Relations Act.[12] In that regard, to contend that unions can continue to represent members and non-members alike without sufficient funds to do so is naïve at best and disingenuous at worst.  As we noted in an analogous situation, construing the constitutionality of West Virginia's system for providing court-appointed counsel to represent indigent criminal defendants, "[i]nevitably, economic pressure

---

[10] "Free riders" is a term curiously absent from the majority opinion.  See text *infra*.
[11] Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136 (1947).
[12] National Labor Relations Act, 29 U.S.C. §§ 151 – 169 (1935).

must adversely affect the manner in which at least some cases are conducted." *Jewell v. Maynard*, 181 W. Va. 571, 579, 383 S.E.2d 536, 544 (1989). This point was succinctly made by Justice Kagan in her dissenting opinion in *Janus*,138 S. Ct. at 2491,

> the majority again fails to reckon with how economically rational actors behave – in public as well as private workplaces. Without a fair-share agreement, the class of union non-members spirals upward. Employees (including those who love the union) realize that they can get the same benefits even if they let their memberships expire. And as more and more stop paying dues, those left must take up the financial slack (and anyway, begin to feel like suckers) – so they too quit the union. And when the vicious cycle finally ends, chances are that the union will lack the resources to effectively perform the responsibilities of an exclusive representative – or, in the worst case, to perform them at all. The result is to frustrate the interests of every government entity that thinks a strong exclusive-representation scheme will promote stable labor relations.

(Internal citation omitted.)

Further, the notion that the grant of exclusive bargaining authority to a union is "compensation" for its mandate to provide services to free riders, a notion first explicated at length by the majority in *Sweeney*, *supra*, in dicta,[13] and then adopted wholesale by the majority in *Janus*, is legalistic argle-bargle at its highest and best. The union's exclusive authority to bargain collectively is not a benefit; it is "the performance of the mutual *obligation* of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment." National Labor Relations Act, 29 U.S.C. 158(d) (emphasis supplied). Simply put, the exclusive bargaining authority of a

---

[13] After noting that "no argument based on the Takings Clause was advanced by the Union, and so any such argument was forfeited," the majority in *Sweeney* went on to discuss the issue at length, concluding that "we believe the union is justly compensated by federal law's grant to the Union the right to bargain exclusively with the employer." 767 F.3d at 666.

union is the *sina qua non* of its existence, since in the absence of such authority, *nothing* can force the employer to the bargaining table. Allowing the union to function as a union cannot fairly be deemed compensation for requiring it to do so for nothing.

Third, the suggestion that the loss of agency fees will do no real harm to the respondent unions, or to the workers they represent, is, to put it kindly, far removed from reality. The work of the union costs money – money for office employees, union reps, lawyers, experts, office space, operating expenses, and a myriad of other expenses too numerous to mention – everything required to effectively negotiate contracts, administer them, and represent individuals in grievance and disciplinary matters. These are huge and important tasks. As the United States Supreme Court recognized in *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 221–22 (1977), overruled on legal grounds by *Janus*,

> The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged 'fairly and equitably to represent all employees …, union and nonunion,' within the relevant unit.

(Internal citations and footnote omitted.) These facts are no less true today than they were at the time *Abood* was decided; and they are no less true today than they were forty-one years after *Abood*, when the *Janus* court determined that the First Amendment rights of free riders "to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees," *id.*, trumps all else.

Under *Janus*, and under today's majority opinion, free riders are the proverbial tail wagging the dog – a situation perilous to the dog's health and, ultimately, its continued existence. Can it seriously be thought that a little "belt-tightening" will allow the unions to continue to competently perform the critical services described in *Abood* as more and more workers realize that they don't have to pay for any of these union-provided benefits -- they can get them for nothing? And can it seriously be contended that as more and more union members realize they're paying not only for the benefits the union extends to them but also for those same benefits extended to the free riders, they won't decide to become free riders themselves?

In my view, the legislation at issue was intended to sound the death knell for both public and private workers' unions in West Virginia – nothing more and nothing less. It is one thing for a state to prohibit closed-shop, or "union security," agreements, by which workers are required to join a union as a condition of employment; the states' authority to do so was decided decades ago and is beyond dispute. *See, e.g., Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102-03 (1963) ("it is plain that Congress left the States free to legislate" in the field of union-security agreements … [and thus] "even if [a] union-security arrangement clears all federal hurdles, the States by reason of § 14(b) have the final say *and may outlaw it*." (Emphasis added.) Indeed, the lengthy discussion of this non-issue in the majority opinion is something of a red herring, as the circuit court *upheld* those parts of the Workplace

10

Freedom Act prohibiting closed-shop agreements[14] and the petitioners have not cross-appealed from that ruling. West Virginia is officially a right to work state, and no one is arguing to the contrary.

However, it is another thing entirely to require a union to represent the interests of all workers, including non-union workers, in all employment-related matters, while simultaneously denying them, under penalty of criminal prosecution, the right to collect fees from the non-union workers for that representation. Federal law imposes the duty on unions to represent the interests of non-union workers, and now state law has imposed the duty on them to do it without compensation. As Chief Judge Wood of the United States Court of Appeals for the Seventh Circuit noted in his dissenting opinion in *Sweeney*, 767 F.3d at 671, remarking on the proverbial "one-two punch" of federal law mandating the union to represent free riders while state law prohibits it from being compensated for such representation, "[t]oday's decision … lays bare an unconstitutional confiscation perpetuated by our current system of labor law." *See also Morrisey I*, 239 W. Va. at 653, 804 S.E.2d at 903 (Davis, J., dissenting):

> That free-riding nonunion members are being excused from paying their fair share of the union's collective bargaining expenses that have inured to the free riders' benefit is the problem – which the majority declines to acknowledge, much less redress … [B]ecause exclusive representative unions have an obligation to represent *all* employees in a workplace fairly and without regard for their union membership or affiliation, and the majority has failed to understand that there exists a corollary right to expect nonunion member free

---

[14] "[F]ederal law clearly and unequivocally authorizes a part of the enactment of S.B. 1, that is, the prohibition on requiring employees covered by a collective bargaining contract to be members of the labor union representing them. Indeed, the amendments to the 1971 laws as well as the new provisions of W. Va. Code § 21-5G-2(1) and § 21-5G-3, reflect a sweeping and dramatic change in the public policy of this State, which the West Virginia Legislature, in accordance with the above-cited federal law, has the absolute authority to adopt. Accordingly, this court does not grant any relief that would invalidate those legislative enactments."

riders to bear their proportionate share of the cost of the union's collective bargaining activities, the right to be free from the unfettered taking of one's property no longer is a right guaranteed by the laws of this State.

(Emphasis in original.)

A system wherein unions are required to provide valuable services for all members of the bargaining unit, but without compensation by the unit's free-riders, is not sustainable in the long run, as the Legislature surely knew and as the majority surely knows. Something's got to give, either the unions' effectiveness or their very existence. In short, the statute serves no purpose other than to thrust a dagger into the heart of labor unions by presenting them with a false choice: represent the interests of non-union members in the bargaining unit without compensation, or don't represent the bargaining unit at all. In this regard, the majority states that "we see nothing in [the Act] that prevents a person from making a voluntary choice to associate with a union or to pay union dues…," citing *Morrisey I*, 239 W. Va. at 640, 804 S.E.2d at 890, and "nothing … to discourage or prevent labor organizations from soliciting workers to join their organization." This reasoning can fairly be termed fatuous; how many workers can be expected to voluntarily pay union dues while the free riders, *see* text *infra*, will enjoy all of the same benefits of union representation without paying a penny? Similarly, what point would there be for the union to become a members-only union, which has no power to force the employer to the bargaining table? A union without the right to collectively bargain is not very far removed from being a mere social club.

12

To say, as the majority does (parroting *Janus*), that unions can avoid all these problems by entering into a "members-only" agreement with the employer, is, as the respondents say in their brief, pie-in-the-sky. If a union is not the exclusive agent for the bargaining unit, i.e., if it seeks to bargain only on behalf of its members, the employer has no duty whatsoever to come to the table. The petitioners conceded this point at oral argument, although they continued to insist – without evidence – that somehow, somewhere, members-only unions happily exist and employers willingly negotiate with individuals and small groups of employees on an ad hoc basis.

Although I strongly disagree with many of the pronouncements contained in the majority opinion, I will mention only a few of the most egregious, beginning with the cavalier statement that "we find no grounds to apply a more stringent level of protection [under the West Virginia Constitution] than that afforded under the United States Constitution." First, it must be emphasized that this crabbed view of the expanded protections which may be afforded under our state constitution should not be extrapolated beyond the specific facts of this case, or beyond the context of the specific issue presented here; for although this Court has found that "[t]he protections inherent and explicit in [W. Va. Const., art. III § 16] parallel associational, assemblage, and petition protections found under the first amendment," *Woodruff v. Board of Trustees of Cabell Huntington Hosp.*, 173 W. Va. 604, 609, 319 S.E.2d 372, 378 (1984), we have *never* held that our constitution cannot be interpreted to provide those protections for West Virginia citizens above and beyond what is found under the federal constitution. Indeed, we have consistently held to the contrary in a variety of cases involving constitutional freedoms and rights.

> [S]ection three of article III [of the West Virginia Constitution] provides that: 'Government is instituted for the *common benefit*,

13

protection and *security* of the people, nation or community.' W. Va. Const. art. III, § 3 (emphasis supplied). The federal constitution is devoid of any language stating that the federal government is instituted for the 'commonn benefit' and 'security' of its citizens. Although our due process clause does not significantly differ in terms of its language from the Fifth and Fourteenth Amendments to the federal constitution, this Court has determined repeatedly that the West Virginia Constitution's due process clause is more protective of individual rights than its federal counterpart.

*Women's Health Ctr. of W. Va., Inc. v. Panepinto*, 191 W. Va. 426, 441-42, 446 S.E.2d 658, 663-64 (1993) (footnote and internal citation omitted). *See also Adkins v. Leverette*, 161 W. Va. 14, 19-20, 239 S.E.2d 496, 499 (1977) ("While it is true that a state may not interpret its constitutional guarantee [which is identical to a federal constitutional guarantee] below the federal level, nothing prevents a state court from equaling or exceeding the federal standard."); Syl. Pt. 2, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979) ("The provisions of the Constitution of the State of West Virginia may, in certain instances, *require* higher standards of protection than afforded by the Federal Constitution.") (emphasis supplied); *Hendershot v. Hendershot*, 164 W. Va. 190, 263 S.E.2d 90 (1980) (declining to follow federal precedent and holding that article III, section 14 of state constitution requires a jury trial for any offense when the penalty involves a term of incarceration, however short); *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 530-31, 276 S.E.2d 205, 210 (1981) (article III, section 5 of state constitution supports a heightened concern for the proportionality of criminal sentences beyond that contained in the eighth amendment to the federal constitution); *State ex rel. Harper v. Zegeer*, 170 W. Va. 743, 296 S.E.2d 873 (1982) (under West Virginia Constitution, which provides protections beyond those contained in the eighth amendment to the United States Constitution, criminal punishment of chronic alcoholics for public intoxication held unconstitutional); Syl. Pt. 1, *State v. Bonham*, 173 W. Va. 416, 317 S.E.2d 501 (1984); *Queen v. W. Virginia Univ. Hosps., Inc.,* 179 W. Va. 95, 106, 365 S.E.2d 375, 386 (1987)

("It is not yet clear just what the federal courts will determine to be adequate notice and a meaningful opportunity to respond, and we, of course, reserve our option to extend broader protections to workers than the federal courts may require."); Syl. Pt. 3, *State v. Neuman*, 179 W. Va. 580, 581, 371 S.E.2d 77, 78 (1988) ("The West Virginia Constitution, art. III, § 10, provides a criminal defendant a level of due process protection at least equal to that provided through the fifth and fourteenth amendments to the United States Constitution, and may, in certain circumstances, require higher standards of protection."); Syl. Pt. 1, *State v. Osakalumi*, 194 W Va. 758, 461 S.E.2d 504 (1995); *State ex rel. Carper v. W. Va. Parole Board*, 203 W. Va. 583, 590 & n.6, 509 S.E.2d 864, 871 & n.6 (1998) ("This Court has determined repeatedly that the *West Virginia Constitution* may be more protective of individual rights than its federal counterpart."); *State v. Mullens*, 221 W. Va. 70, 89, 650 S.E.2d 169, 188 (2007) ("we may interpret state constitutional guarantees in a manner different than the United States Supreme Court has interpreted comparable federal constitutional guarantees") (internal citation omitted).

In a scholarly article in the West Virginia Law Review,[15] the late Justice Thomas B. Miller reviewed this Court's precedents and found two common analytical strands in the relevant cases. "First, the court has shown an awareness of areas of traditional state concern and has been willing to extend broader protection."[16] In this regard, Justice Miller cites education and educational funding as an area of traditional state concern; hence this Court's decision in *Pauley*, *supra*, and its progeny. "Second, where the state constitution uses wording which provides protections over and above federal guarantees, the court has shown a willingness to implement it

---

[15] Thomas B. Miller, *The New Federalism in West Virginia*, 90 W. Va. L. R. 51 (1987).
[16] *Id*. at 64.

by developing its own state-law jurisprudence."[17]  Here, Justice Miller cites our proportionality cases, *Wanstreet*, *supra*, and its progeny, noting the express proportionality principle contained in W. Va. Const., art. III, § 5, which differs from the language contained in its federal counterpart, the eighth amendment.  Even in those cases where we declined to interpret provisions of our constitution as affording greater protection than their counterparts in the federal constitution, we acknowledged our authority to do so in a proper case, and undertook the required analysis. Here, the majority has elected to forego any real analysis of the issue, citing the lack of any specific constitutional provision or case "under which the protection of association rights claimed by a labor organization may be entitled to more stringent treatment than that provided by the United States Constitution."  This overlooks the fact that virtually every legal principle has its genesis in a case of first impression – which, admittedly, this case would be.[18]  But then, for four decades prior to *Janus* it would not have been necessary to even consider such an issue, since it was settled law under *Abood* that non-union employees in a unionized workplace could be required "to pay a fair share of the cost that a union incurs when negotiating on their behalf over terms of employment.  But no part of that fair-share payment could go to any of the union's political or ideological activities." *Janus*, 138 S. Ct. at 2487 (Kagan, Justice, dissenting).

---

[17] *Id*.

[18] Although the *Jewell* case strongly supports a finding that W. Va. Code § 21-1A-3 is confiscatory, and thus unconstitutional, it is not squarely on point as its holding was tied inextricably to its specific facts: "where the caseload attributable to court appointments is so large as to occupy a substantial amount of an attorney's time and thus substantially impairs his ability to engage in the remunerative practice of law, or where the attorney's costs and out-of-pocket expenses attributable to representing indigent persons charged with crime reduce the attorney's net income from private practice to a substantial and deleterious degree, the requirement of court appointed service will be considered confiscatory and unconstitutional." *Jewel*, Syl. Pt. 1, in part.

I admit that there is no clear or simple answer to the question of whether the West Virginia Constitution provides a more stringent level of protection for West Virginia's unionized workers than is afforded under federal law, as set forth in *Janus*. With reference to the analytical threads noted *supra*, there can be little doubt that issues involving unions, employers and workers fall within the rubric of "area[s] of traditional state concern"; the struggle of West Virginia workers to unionize, and the struggle of some employers to stop them, is the stuff of legend. On the other hand, however, there is no specific constitutional provision or language which, in Justice Miller's words, "provides protections over and above federal guarantees." Further, as pointed out in the majority opinion, every state court which has decided the issue of agency fees has agreed, in whole or in part, with the reasoning of *Janus*. Given these competing considerations, I cannot say with certainty that this Court should go out on a long, lonely limb and stake out an outlier position. However, I believe that our precedents require at the very least, that we carefully examine the issues presented in this case within the framework of the West Virginia Constitution – regardless of the ultimate decision. The respondents deserve no less.

Several other things in the majority opinion bear noting, as they demonstrate the majority's unwillingness to even discuss, let alone confront, whether the statute at issue is confiscatory under our *Jewell* decision. In a unionized workplace, a majority of the individuals in a collective bargaining unit have thrown their lot in with the union, believing that it will be to their benefit to have a representative that can force the employer to the table to negotiate terms and conditions of employment. Now those individuals are required by law to subsidize the minority – the free riders. It is telling that in its lengthy opinion, the majority mentions "free riders" only

17

once – and that mention is buried deep in a footnote[19] -- despite the fact that in virtually every other opinion ever written, from *Abood* through and including *Janus* and beyond – the problem of free riders is deemed to be at the heart of the constitutional challenges to bans on agency fees. Even the late Justice Antonin Scalia, a staunch conservative, acknowledged that "[w]hat is distinctive, however, about the 'free riders' who are nonunion members of the union's own bargaining unit is that in some respects *they* are free riders whom the law *requires* the union to carry—indeed, requires the union to go *out of its way* to benefit, even at the expense of its other interests." *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 556 (1991) (Scalia, J., concurring in part and dissenting in part) (emphasis in original). In this regard, it may be reasonably inferred that the majority had some difficulty explaining that what has historically been seen as the unfortunate byproduct of a statutory ban on agency fees – dues-paying union members are forced to subsidize free riders -- has somehow morphed into a constitutional "freedom" on the part of the free riders to avoid paying for services rendered on their behalf. Never, until today, has free riding been seen as a West Virginia value, let alone a value deserving of constitutional protection.

Also worthy of note is the majority's lengthy footnote 40, explaining why it has determined to come up with a brand new name for what every other court in America (including the United States Supreme Court) calls agency fees or fair-share fees: specifically, the amounts of money which, prior to today, non-members have been required to pay to unions for the union's services (bargaining, administration, and representation in grievance and disciplinary matters) that specifically benefit them. Now, says the majority, we're going to call these fees "compelled dues"

---

[19] In footnote 74, the majority repeats the complaint made by some employee – presumably Mr. Janus -- that "he is not a free rider on a bus headed for a destination that he wishes to reach but is more like a person shanghaied for an unwanted voyage." *Janus*, 138 S. Ct. at 2466.

because … well, why? Because the word "compelled" implies coercion, a concept all West Virginians would abhor, and the word "dues" implies forced membership, despite universal agreement that no employee can be forced to be a member of a union as a condition of his or her employment. A nice piece of legerdemain, this relabeling, and one that is nakedly political.

Finally, I am compelled to note the sheer irony of the majority opinion, as I am hard-pressed to imagine a decision less "conservative" than this one is; it upholds, and indeed extols the virtues of, W. Va. Code § 21-1A-3, a statute which exemplifies Big Government at its most overbearing. The West Virginia Constitution does two things: it sets forth the rights of citizens, while restricting the power of government to interfere with those rights. *See generally State ex rel. Cooper v. Tennant*, 229 W. Va. 585, 730 S.E.2d 368 (2012). Here, in the absence of any evidence that West Virginia's employers and unionized employees are unable to fairly and reasonably negotiate and set the terms of their respective labor agreements, the powers-that-be in Charleston have stepped in and set the terms for them – with criminal penalties for non-compliance, no less. Any legislator who voted for passage of this statute should be booed off the stage the moment he or she professes to be in favor of limited government and individual rights.

In more than thirty years of service in the judicial branch of government, both as a Kanawha County Circuit Judge and then as a Justice of the Supreme Court of Appeals of West Virginia, I have tried to follow my judicial oath of office, which requires me to decide cases fairly and impartially, based on the facts and evidence presented and on the governing law, *not* based on my own personal, religious, and/or political beliefs. As a result, there have been many times I

19

have voted to uphold a statute that I personally found to be ill-conceived, because our precedents demand it. Following this Court's longstanding policy of judicial restraint has been especially difficult in this case, as I strongly believe that W. Va. Code § 21-1A-3 will ultimately lead to the slow death of the unions which built this state. However, the wisdom of the statute is not the question before us; the question is whether the law is constitutional, not whether it is mean-spirited and intended to impair the rights of West Virginia workers by impairing the ability of unions to work on their behalf. In that regard, the legislators who enacted the Workplace Freedom Act were elected by the people and are answerable to them; "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process." *Cooper*, 229 W. Va. at 615, 730 S.E.2d at 398, quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). Thus, only time will determine whether West Virginia voters support the Legislature's gift to them of a "freedom" that will ultimately eviscerate their hard-won ability to improve their conditions of employment through vigorous collective bargaining.

In reality, the merits of this case were decided in *Morrisey I*, which I termed a "stunning failure to recognize our jurisdictional limits in explicitly resolving constitutional issues in the context of the review of a preliminary injunction," 239 W. Va. at 648, 804 S.E.2d at 898 (Workman, J., concurring in part and dissenting in part); and now, with the subsequent issuance of the *Janus* opinion, any argument in support of agency fees has become a jurisprudential dead letter. Accordingly, I reluctantly concur in the judgment of the Court.